Denise René DUPRÉ, Plaintiff,

v.

HARRIS COUNTY HOSPITAL DISTRICT d/b/a Ben Taub General Hospital, Defendant.

No. Civ.A. H–96–3280.

United States District Court,
S.D. Texas.

June 12, 1998.

Richard S. London, London Schaeffer and Patterson, Houston, TX, for plaintiff.

Mary E. Baker, Office of Harris County Attorney, Houston, TX, Bruce Stephen Powers, Office of Harris Cty. Attorney, Houston, TX, for defendant.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant Harris County Hospital District's ("Harris County") Motion for Summary Judgment (# 22). Harris County seeks summary judgment on Plaintiff Denise René Dupré's ("Dupré") claims of discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and intentional infliction of emotional distress.

Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that Harris County's motion should be granted.

I. *Background*

On September 6, 1992, Dupré was hired by the Assistant Vice President of Perinatal Nursing—Leela Thomas ("Thomas")—to serve as a nurse in the neonatal intensive care unit at Ben Taub Hospital ("Ben Taub"). Shortly thereafter, Dupré requested "a compressed weekend schedule which meant working eight hours or more on consecutive days...." Her request was granted, resulting in Dupré's shifts regularly lasting about sixteen hours. Dupré generally worked at the hospital only on Fridays, Saturdays, and Sundays, although she would occasionally work other days. While employed at Ben Taub, Dupré was supervised by Head Nurse Pippa Andrews ("Andrews"), and subsequently by Head Nurse Felicia · King ("King"). During this period, Leela Thomas ("Thomas") was the Director of Nursing.

In December 1994, Dupré took time off from work to seek treatment for depression. She was treated by Louis A. Fallace, M.D. ("Fallace"), who prescribed the medications Klonopin, Paxil, and lithium and advised her to rest. It was at this time she was diagnosed as suffering from bipolar disorder.[1] Dupré provided Harris County with a Return to Work form signed by Fallace, dated December 15, 1994, which states:

> This is to certify that Denise Dupré has been treated by the undersigned for an illness, from 12–8–94 to Present.
>
> It is my impression that this patient has recovered sufficiently to return to work on or about 12–16–94.

The letter does not state the nature of the illness for which Dupré was treated, although it does identify Fallace as a physician specializing in psychiatry.

According to Dupré, she informed King and Thomas of her bipolar disorder and depression around this time.[2] Dupré also alleged that all of her co-workers were aware of her disability, while Thomas stated at her deposition that she was only aware that Dupré "had an attendance problem." Dupré contends that she specifically informed King that her disability restricted the amount of stress that she could endure on the job. Further, she purportedly told King that the physical fatigue associated with her condition and her medication also limited her ability to work a 16–hour shift. Dupré alleges that she requested accommodation of her condition in the form of a transfer to a low-risk nursery or a shorter shift. Dupré maintains that King refused her request and told her that no other positions were available.

Dupré contends that she also informed Thomas of these difficulties and confided that she suffered additional stress because a man who had raped her as a child—Dupré's former brother-in-law—worked in an adjacent unit. Dupré asserts that she requested a transfer to a less-stressful position in a regular nursery or a low-risk nursery, or that she be given a part-time position. Thomas allegedly refused to transfer Dupré or to place her in a part-time position, stating that there were no other nursery positions available and that the hospital did not have any part-time positions. Dupré contends that "Febe Aldana and Guadalupe Manito ... were transferred to positions which were less stressful than mine around the same time that I requested such a transfer." The affidavit of Tena Gardner ("Gardner")—Director of Human Resources for Harris County—states that the hospital's records confirm that Phebe Aldana ("Aldana") transferred from

---

**1.** The Fifth Circuit has described the attributes of bipolar disorder, previously know as manic-depression:

> Bipolar disorder is a psychosis involving a mood disorder characterized by swings from mania to depression. Mania is characterized by elevated mood and associated behavioral responses. Characteristics of mania are hyperactivity, optimism, flamboyance, loud, pressured speech, garrulousness, distractibility, delusions of grandeur, disorganized behavior pattern, and poor judgment. Depression is characterized by lowered mood state and related behavior. Characteristics of depression are sadness, hopelessness, feelings of guilt and

> worthlessness, social withdrawal, psychomotor retardation and vegetative somatic symptoms including anorexia, weight loss, and insomnia. The disability experienced from bipolar disorder ranges from mild to severe.

*Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 160 n. 2 (5th Cir.) (citing ALAN BALSAM, M.D. & ALBERT P. ZABIN, DISABILITY HANDBOOK 628–29 (1990)), *cert. denied*, —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996).

**2.** Dupré testified at deposition that she did not remember whether she informed King of her illness before or after she took time off from work.

the neonatal intensive care unit to the new-born nursery, but not until April 17, 1995, several months after Dupré was terminated. As to Guadalupe Manito ("Manito"), the hospital's records indicate that she worked in the neonatal intensive care unit until her resignation on October 21, 1995, nine months after Dupré's termination, and, following her resignation, she was listed on the nursing registry. It is undisputed, however, that two "potentially less stressful" positions that became available on December 26, 1994, and January 2, 1995, during Dupré's tenure at Ben Taub, were posted in the emergency room. Felecia Peterson—Former Nurse Manager of the Neonatal Intensive Care Unit at Ben Taub—states in her affidavit that job listings for nurse "positions at Ben Taub were posted on the first floor of the hospital and were readily available for Ms. Dupré's review." In fact, Dupré acknowledges in her affidavit that positions in the regular and low-risk nurseries were posted in the emergency room. There is no evidence, however, that Dupré ever applied for either of these positions or for any position posted at Ben Taub.

Throughout Dupré's employment at the hospital, nurses in the neonatal intensive care unit were responsible for the care of two or three infants. On January 13, 1995, King filed an Employee Report concerning an allegation that Dupré was negligent and conducted unsafe nursing practices with respect to one of the infants under her care. Specifically, the report alleges that on January 8, 1995, Dupré "incorrectly transcribe [sic] PBS (phenobarbital) for baby Boyd. 5 mg daily was ordered but 20 mg daily was transcribed to the Kardex. The order was signed by Ms. Dupré." King filed another Employee Report on January 13, 1995, alleging that on January 8, 1995, Dupré was negligent and unsafe in her nursing practices insofar as she incorrectly hung the intravenous fluids for baby Boyd ("Boyd"). Specifically, she transposed the UVC and UAC lines.[3] Dupré, however, avers that the fluid lines were correctly positioned, and that the actual problem resulted from a malfunction in the line pumps. Nevertheless, Dupré was placed on probation for ninety days, purportedly based on these two incidents. According to Dupré, the stated reasons are a mere pretext, and her disability and absences from work mused by her illness were the actual motivating factors for her being placed on probation. She contends that Harris County's refusal to investigate the true cause of the fluid lines incident is based on her disability. Dupré argues that "a nurse who was not disabled would not have been placed on probation, would have been given a real investigation of the incident. . . ." Dupré further alleges that King "constantly harassed and questioned" her about her medical condition and informed her that she could not miss any more work during the probationary period.[4] In addition, Dupré perceived King as being "more distant," "very hurried," uncomfortable around her, and not as friendly as she had been.

Dupré's probationary period was scheduled to run from January 24, 1995, to April 23, 1995. Dupré confirmed at deposition that she was notified that any incidents of negligence or unsafe practices during this period would result in further disciplinary action, including termination. On January 25, 1995, King filed another Employee Report, in which she alleged that on January 22, 1995, Dupré and another nurse, Adrian DeJohnnette ("DeJohnnette"), "did not do the change-of-shift chart check" and that Dupré did not do the 24–hour chart check. Specifically, Boyd was to be fed 6.7 cc every three hours, but a mistranscription by DeJohnnette recorded the order as 6.7 cc every hour.[5]

3. Although the parties have not explained the problem with transposition, Thomas related in her deposition: "[D]ifferent kinds of fluids are given to neonates through the UAC and UVC lines; and some fluids that are supposed to be going into the vein, if they are given into the artery, that can cause big problems."

4. In her complaint, Dupré alleges that both King and Andrews "constantly harassed and questioned her about her medical conditions." In her deposition, however, Dupré stated that Andrews left the hospital before she was diagnosed with bipolar disorder and that she was never questioned or harassed by Andrews. Similarly, at deposition Dupré was asked: "Did Felicia King ever come to you and ask you questions about your disability or your diagnosis of bipolar disorder?" She replied, "no."

5. Dupré refers to this form of feeding as "the milk drip."

Dupré contends, however, that she checked the chart, but failed to notice that the dosage was to be administered every three hours rather than every hour. As a result of Dupré's oversight, DeJohnnette's mistranscriptions remained undetected, and "Boyd received the incorrect rate of gastric feed flow for another eight hours." Consequently, Boyd required additional corrective care, including a chest x-ray, the administration of oxygen, and the administration of Lasix.

After the Employee Report was filed, Dupré attended a meeting with King and Thomas during which they discussed the incident. Prior to the meeting, King informed Thomas that Dupré complained of being depressed. Harris County terminated Dupré on January 30, 1995, purportedly for failing to discover DeJohnnette's error. It also subjected her to peer review and reported her alleged misconduct to the Texas Board of Nurse Examiners. DeJohnnette received a less-severe discipline—suspension for three days and ninety-days probation—purportedly because she was not already on probation. Dupré asserts that, were it not for her disability, she "would have not been terminated when another nurse had mistranscribed feeding orders."

After her termination, Dupré filed a grievance with Harris County. A grievance hearing was held on February 21, 1995. On February 24, 1995, Thomas sent a letter to Richard London—Dupré's attorney—stating:

> I have considered all of the information presented at Ms. Dupré's grievance hearing on February 21, 1995. Because of the significance of the multiple errors from a medical point of view, I have decided to uphold the termination.

The termination also was upheld at the next step of the grievance procedure. On April 4, 1995, Harris County informed Dupré that because she had filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), it was terminating the grievance procedure as directed by its internal policies. Specifically, the Harris County Hospital District Employee Handbook states in part: "In the event that exter-

nal proceedings are invoked prior to or during a grievance procedure, the grievance or potential grievance will be considered resolved through any agreements resulting from the external process."

Dupré has held five different nursing positions following her termination from Ben Taub. Between April and June 1995, she was employed as a traveling nurse for Medical Express, which primarily entailed caring for newborns. She testified that she left this job because of exhaustion created by her depression. After an eight-month period of unemployment, she served as a "school nurse fill-in" for the Lamar School District. She worked as a temporary nurse in late 1995, 1996, and 1997, dealing with infants, intensive care nursery, and postpartum mothers. Among the places she worked were Women's Hospital, HS Doctor's Hospital in Coral Gables, Florida, Mercy Hospital in Laredo, Texas, Texas Children's Hospital in Houston, and Conroe Regional Medical Center. From June 1997 to the present, Dupré has worked as a nurse at the Conroe Regional Medical Center in the neonatal intensive care unit. She reports that none of these employers has complained about her performance. Dupré also testified that in 1995, she applied for permanent nursing positions at St. Joseph's Hospital, Hermann Hospital, Visiting Nurses, Methodist Hospital, Southwest Memorial, Richmond State School, a hospital formerly known as Pasadena General, and at Polly Ryon in Rosenberg, Texas.

Dupré filed a charge of discrimination with the EEOC on March 20, 1995, alleging discrimination on the basis of a disability as well as retaliation. Subsequently, on May 26, 1995, she filed another charge of discrimination alleging retaliation due to Harris County's decision to end the internal review of her termination.[6] On October 2, 1996, Dupré instituted this action, seeking recovery for discrimination and retaliation under the ADA as well as intentional infliction of emotional distress under Texas law.

---

6. Despite Dupré's assertion that she filed the second charge on May 26, 1995, it is dated and

was notarized on June 1, 1995.

## II. Analysis

### A. Summary Judgment Standard

Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* 134 F.3d 319, 321 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 324 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). The moving party, however, need not negate the elements of the nonmovant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996) (citing *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Marshall,* 134 F.3d at 321–22; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1075. All the evidence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." *Williams v. Time Warner Operation, Inc.,* 98 F.3d 179, 181 (5th Cir.1996) (citing *Lindsey v. Prive Corp.,* 987 F.2d 324, 327 n. 14 (5th Cir.1993)); *see Marshall,* 134 F.3d at 321; *Messer v. Meno,* 130 F.3d 130, 134 (5th Cir.

1997); *Hart v. O'Brien,* 127 F.3d 424, 435 (5th Cir.1997). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505); *see Marshall,* 134 F.3d at 321.

Nevertheless, the nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, or "only a 'scintilla' of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Serv. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.

### B. Americans with Disabilities Act

The ADA is a federal antidiscrimination statute designed to prevent otherwise qualified individuals from being discriminated against in employment based on a disability. *See* 29 C.F.R. § 1630, App.; *Taylor,* 93 F.3d at 160–61. To achieve this goal, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Taylor,* 93 F.3d at 162; *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir.1995); *Daugherty v. City of El Paso,* 56 F.3d 695, 696 (5th Cir.1995), *cert. denied,* 516 U.S. 1172, 116 S.Ct. 1263, 134

L.Ed.2d 211 (1996); *Dutcher v. Ingalls Shipbuilding,* 53 F.3d 723, 725 (5th Cir.1995). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

### 1. *Prima Facie Case and Burden of Proof*

To recover under the ADA, the plaintiff must prove that she was discriminated against on the basis of her disability. *See Daigle,* 70 F.3d at 396; *Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 510–11 (1st Cir. 1996); *Allison v. Department of Corrections,* 94 F.3d 494, 497 (8th Cir.1996). The plaintiff may present either direct evidence of disability discrimination or may employ the indirect method of proof utilized in other types of discrimination cases. *See Taylor,* 93 F.3d at 162; *Rizzo v. Children's World Learning Ctrs., Inc.,* 84 F.3d 758, 762 (5th Cir.1996); *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the absence of direct evidence of discrimination, the plaintiff can establish a *prima facie* case under the ADA by showing that:

(1) she has a "disability;"

(2) she is qualified for the job;

(3) she was subject to an adverse employment action; and

(4) she was replaced by a non-disabled person or was treated less favorably than non-disabled employees.[7]

*See Burch v. Coca–Cola Co.,* 119 F.3d 305, 320 (5th Cir.1997) (citing *Daigle,* 70 F.3d at 396), *cert. denied,* —— U.S. ——, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998); *see also Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1092 (5th Cir.1996) (citing *Rizzo,* 84 F.3d at 763).

If the plaintiff succeeds in making this *prima facie* showing, a rebuttable presumption of discrimination arises, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Daigle,* 70 F.3d at 396 (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089); *Olitsky v. Spencer Gifts, Inc.,* 964 F.2d 1471, 1478 n. 19 (5th Cir.1992), *cert. denied,* 507 U.S. 909, 113 S.Ct. 1253, 122 L.Ed.2d 652 (1993); *EEOC v. Texas Bus Lines,* 923 F.Supp. 965, 969–70 (S.D.Tex. 1996). While the employer need not prove that its actions were motivated by the legitimate reason, it must produce some evidence in support of its proffered reason. *See Daigle,* 70 F.3d at 396 (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507–10, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *Texas Bus Lines,* 923 F.Supp. at 970. "The defendant's burden is merely one of production and not of persuasion". *See Burdine,* 450 U.S. at 257–58, 101 S.Ct. 1089. "If the employer produces any evidence 'which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle,* 70 F.3d at 396 (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 507, 113 S.Ct. 2742); *see also Texas Bus Lines,* 923 F.Supp. at 970.

If the employer meets its burden of production, the presumption is dissolved, and the burden shifts back to the plaintiff to demonstrate that the proffered reason is a pretext for discrimination—the defendant's alleged nondiscriminatory reason is false and the real reason for the adverse action is disability discrimination. *See Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 148 (5th Cir.1995) (citing *St. Mary's Honor Ctr.,* 509 U.S. at 510–11, 113 S.Ct. 2742), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996); *Daigle,* 70 F.3d at 396. As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that she has been the victim of illegal discrimination based on her disability. *See id.* (citing *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742).

---

7. "The elements of a plaintiff's prima facie case necessarily vary according to the facts of the case and the nature of the claim." *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 448 (5th Cir.1996). Thus, the fourth element merely sets forth two nonexclusive ways in which a plaintiff can demonstrate that an adverse employment decision was made "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *see also EEOC v. J.M. Huber Corp.,* 927 F.2d 1322, 1328, n. 24 (5th Cir.1991).

To prevail on an ADA claim, the plaintiff must prove that an adverse employment decision was made solely because of her disability. *See Turco,* 101 F.3d at 1092; *Rizzo,* 84 F.3d at 763.

### a. *ADA–Qualified Disability*

Harris County contends that Dupré has not satisfied her burden with respect to showing that she suffered from an ADA-qualified disability.

■ The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such impairment.

42 U.S.C. § 12102(2); *see also Pryor v. Trane Co.,* 138 F.3d 1024, 1026 (5th Cir. 1998); *Hamilton v. Southwestern Bell Tel. Co.,* 136 F.3d 1047, 1050 (5th Cir.1998); *Still v. Freeport–McMoran, Inc.,* 120 F.3d 50, 52 (5th Cir.1997); *Robinson v. Global Marine Drilling Co.,* 101 F.3d 35, 36 (5th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1820, 137 L.Ed.2d 1028 (1997). The ADA further restricts the meaning of physical and mental impairment to:

(1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or

(2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

*Dutcher,* 53 F.3d at 726 n. 5 (quoting 29 C.F.R. § 1630.2(h)(1), (2)). "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities." *Id.* at 726. The ADA defines neither "substantially limits" nor "major life activities," but the EEOC regulations under the ADA, which adopt the same definition of major life activities as used in the Rehabilitation Act, provide significant guidance. *Id.; see also Hamilton,* 136 F.3d at 1050; *Bolton,*

36 F.3d at 942; *Chandler,* 2 F.3d at 1391. "Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Hamilton,* 136 F.3d at 1050 (quoting 29 C.F.R. § 1630.2(i)); *Dutcher,* 53 F.3d at 726; *Bolton,* 36 F.3d at 942; *Chandler,* 2 F.3d at 1390. The factors that should be considered in determining whether an impairment substantially limits a major activity include:

(1) the nature and severity of the impairment;

(2) its duration or expected duration; and

(3) its permanent or expected permanent or long-term impact.

*See Hamilton,* 136 F.3d at 1050 (citing 29 C.F.R. § 1630, App., § 1630.2(j)); *Oswalt v. Sara Lee Corp.,* 74 F.3d 91, 92 (5th Cir.1996); *Dutcher,* 53 F.3d at 726; *Bolton,* 36 F.3d at 943. Substantially limited means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

*Pryor,* 138 F.3d at 1026 n. 12 (quoting 29 C.F.R. § 1630.2(j)(i), (ii)); *accord Hamilton,* 136 F.3d at 1050 n. 5; *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1119 (5th Cir. 1998); *Dutcher,* 53 F.3d at 726 n. 8.

■ While "working" is listed as one of the major life activities, " 'working' does not mean working at a particular job of [one's] choice." *Turco v. Hoechst Celanese Chem. Group, Inc.,* 906 F.Supp. 1120, 1127 (S.D.Tex. 1995) (citing *Wooten v. Farmland Foods,* 58 F.3d 382, 385–86 (8th Cir.1995)), *aff'd,* 101 F.3d 1090 (5th Cir.1996); *see also Dutcher,* 53 F.3d at 727. " [S]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not

constitute a substantial limitation in the major life activity of working.' " *Pryor,* 138 F.3d at 1027 (quoting 29 C.F.R. § 1630.2(j)(3)(i)); *see Hamilton,* 136 F.3d at 1051; *Sherrod,* 132 F.3d at 1120; *Still,* 120 F.3d at 52. "An employee's inability to perform one aspect of his job while retaining the ability to perform the work in general does not amount to a substantial limitation of the activity of working." *Dutcher,* 53 F.3d at 727 (citing *Chandler,* 2 F.3d at 1392) (citing with approval *Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1343 (S.D.Tex.1987), *aff'd,* 863 F.2d 881 (5th Cir.1988)).

■ In the case at bar, Dupré's bipolar disorder and the medication prescribed to treat it reportedly left her fatigued, incapable of working a 16–hour shift, and unable to deal with stressful situations. These impairments, however, do not affect the major life functions set forth in the EEOC's regulations. *See Palmer v. Circuit Court of Cook County,* 117 F.3d 351, 352 (7th Cir .1997) (depression and anxiety caused by conflict with supervisor or coworker did not constitute a disability), *cert. denied,* —— U.S. ——, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998); *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 (7th Cir.1996) (heightened anxiety and stress, migraines and depression triggered by an unpleasant supervisor were not substantial limitations on a major life activity). Dupré does not contend that her disability prevents her from caring for herself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working generally. Similarly, Dupré has not provided any medical records, reports, opinions, or documents that even suggest that her ability to work or function in any capacity was substantially limited by her disability or the medication she was taking. *See Adams v. Rochester Gen. Hosp.,* 977 F.Supp. 226, 232 (W.D.N.Y.1997). Indeed, one month prior to her termination, Fallace stated "this patient has recovered sufficiently to return to work on or about 12–16–94." Thus, Dupré's own psychiatrist believed that she was capable of performing the functions of her job. In addition, Dupré alleges that, prior to her termination she sought a transfer to a less-stressful nursing position, which confirms that even Dupré believed her impairment not to be so disabling as to completely foreclose her from working as a nurse.

The evidence fails to demonstrate that Dupré's bipolar disorder prevented her from performing an entire class of jobs, or even a broad range of jobs. A court must reject "plaintiff's argument that she was substantially limited in the activity of working where her condition only restricted her performance of one job . . . ." *Paleologos v. Rehab Consultants, Inc.* 990 F.Supp. 1460, 1465 (N.D.Ga.1998) (holding that plaintiff was not substantially limited in her performance of a major life activity where she experienced stress at the thought of going to work and dealing with management). Rather, Dupré conceded in her deposition that following her termination she has held several nursing jobs similar to the one she held with Harris County. In fact, within months of her termination, she was caring for newborns, and she has held various positions dealing with infants, some in an intensive care nursery, over the past several years. Currently, she is employed as a nurse in the neonatal intensive care unit at Conroe Regional Medical Center, a job she has held for the past year. According to Dupré, none of these employers expressed dissatisfaction with her performance. Thus, it is apparent that her disability does not preclude her from working or from continuing to work in her chosen profession of nursing.

Dupré manifestly "retains the ability to compete successfully with similarly skilled individuals and no facts indicate that [s]he is unable to perform a class of jobs nor a broad range of jobs." *See Hamilton,* 136 F.3d at 1051; *Gaul v. Lucent Tech. Inc.,* 134 F.3d 576, 580 n. 3 (3d Cir.1998) ("we strongly suspect that a plaintiff who is unable to work with individuals who cause him 'prolonged and inordinate stress' cannot be said to be incapable of performing a 'class of jobs or a broad range of jobs in various classes' "). While Dupré's illness may have caused her some difficulty, she has not shown that she has an impairment that substantially limits a major life activity. *See Forrisi v. Bowen,* 794 F.2d 931, 934–35 (4th Cir.1986) (plaintiff with fear of heights is not disabled because his condition did not substantially limit plain-

tiff's work, only his ability to perform particular job); *Howard v. Navistar Int'l Transp. Co.,* 904 F.Supp. 922, 929 (W.D.Wis.1995) (employee did not suffer impairment that substantially limited major life activity, and thus was not disabled, where his only limitation was that he could not operate particular machine), *aff'd,* 107 F.3d 13, 1997 WL 53044 (7th Cir.1997). Having no disability cognizable under the ADA, Dupré has failed to adduce summary judgment evidence that she has a record of having an impairment that substantially limits a major life activity.

■ Similarly, Dupré has not shown that she is regarded by others as having such an impairment nor has she demonstrated she was treated as having such an impairment. Harris County continued to employ Dupré after she allegedly reported her illness to King and Thomas. She continued to hold all of her previous responsibilities and duties following her diagnosis. Other than a statement of her own subjective beliefs, Dupré has offered no evidence indicating that Harris County or its agents regarded Dupré as being limited by her disorder. An employee's own subjective belief of discrimination, however, no matter how genuine, cannot serve as the basis for judicial relief. *See, e.g., Price v. Marathon Cheese Corp.,* 119 F.3d 330, 337 (5th Cir.1997); *Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 42 (5th Cir.1996); *Douglass,* 79 F.3d at 1430; *Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434 (5th Cir.1995); *Armendariz,* 58 F.3d at 153; *EEOC v. Louisiana Office of Community Servs.,* 47 F.3d 1438, 1448 (5th Cir.1995). While Dupré contends that King stated, "I just don't understand you folks, I have not had any experience with mental illness or manic-depressive people personally," this statement, standing alone, does not indicate that King treated Dupré differently because of her bipolar disorder. Therefore, as Dupré has not shown that she suffered from a disability, was limited as to a major life activity as a result of the attitudes of others, or was treated as having a substantially limiting impairment, she has failed to establish the first element of a *prima facie* case of discrimination under the ADA.

b. *Adverse Employment Action*

■ Dupré complains that, in addition to being placed on probation and ultimately terminated, Harris County's discriminatory treatment took various forms, including King's purported questioning about her disorder and King's alleged failure to treat Dupré with the same friendliness that she did prior to learning about her illness.

■ Under the ADA, as in the Title VII context, adverse employment actions include discharges, demotions, refusals to hire, refusals to promote, and reprimands. *See Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 885 (6th Cir.1996) (reassignment to different division not adverse employment action); *Yates v. Avco Corp.* 819 F.2d 630, 638 (6th Cir.1987); *Lulac Councils 4433 & 4436 v. City of Galveston,* 979 F.Supp. 514, 518 (S.D.Tex.1997). With respect to the definition of an "adverse employment action," the Seventh Circuit has explained:

> A materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993) (no adverse action where job transfer merely caused personal inconvenience or altered job responsibilities); *see Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994) (reassignment to a different position without any reduction in title, salary, or benefits was not adverse employment action although new position involved different duties and was more stressful); *Flaherty v. Gas Research Inst.,* 31 F.3d 451, 457 (7th Cir.1994) (semantic change in title and "bruised ego" did not constitute adverse employment action where pay, benefits, and level of responsibility remained the same); *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 885 (7th Cir.1989) (transfer to a dual principalship over two schools with high-

er pay was not an adverse employment action); *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981) (process used in selecting board members that evaluated plaintiff's qualifications for promotion did not involve an adverse employment action).

Here, although Dupré challenges her probation and termination, she does not complain that she was demoted, not promoted, or reprimanded while employed at Ben Taub. Dupré's allegations concerning King's questions about her disability and King's unfriendly demeanor are minor inconveniences that do not rise to the level of actionable conduct. Moreover, while these allegations are found in her complaint, at deposition, Dupré testified that King never asked her questions about her disability. Thus, the only competent evidence that exists on this point refutes Dupré's allegations, as an unverified complaint does not constitute proper summary judgment evidence. *See King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994); *see also Behrens v. Pelletier,* 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996); *Wallace,* 80 F.3d at 1047. Consequently, Dupré has failed to satisfy her burden of showing an adverse employment action as to any claims aside from her probation and termination.

### c. *Replaced by Non-disabled Person or Treated Adversely*

Harris County also contends that Dupré has failed to establish that she was replaced by a non-disabled person or that she was treated less favorably than similarly situated individuals without a disability.

There is no evidence before the court indicating that Dupré was replaced by a non-disabled individual. She has proffered no evidence regarding the identity of the nurse who replaced her, much less whether her replacement was disabled. In fact, the record is devoid of any information concerning whether her former position in the neonatal intensive care unit was filled after her termination. Dupré also has presented no evidence that she suffered disparate treatment when she was placed on probation after two reported incidents of negligence and unsafe practices. She does not contest the mistranscription of Boyd's phenobarbital dosage, which occurred on January 8, 1995, nor does she state that this error was an insufficient cause for being placed on probation. Although she avers that she did not transpose the fluid lines, Dupré has not shown that other similarly situated, non-disabled employees, who were charged with comparable infractions, were not placed on probation.

■ Although she asserts that Harris County failed properly to investigate the alleged transposition of the fluid lines because of discriminatory animus, Dupré has presented no evidence in support of this claim. She has not shown that other individuals, whether disabled or not, were afforded an expanded review process when accused of wrongdoing. Furthermore, she does not allege that she actively sought further review beyond requesting that King and Thomas investigate the alleged incident. She makes no allegation that she attempted to seek redress from hospital officials or that they refused to conduct an inquiry. There also is no indication that she utilized the internal grievance procedure to correct any perceived impropriety with regard to her being placed on probation.

■ With respect to Dupré's failure to notice DeJohnnette's transcription error while performing the change-of-shift chart check and the 24–hour chart check, Dupré does not deny that she was negligent in failing to notice the mistake. Moreover, she does not contend that she should not have be disciplined for her negligence, but only complains that she was disciplined more severely than DeJohnnette. Dupré does not dispute, however, that she was on probation at the time of this incident, while DeJohnnette was not. Nor does Dupré dispute that the Employee Report for the fluid lines incident, which she signed, specifically warned her that "[i]f any other incident of negligence/unsafe practices is reported during this period, further disciplinary action (including termination) will be taken." Rather, she admitted that she was warned that any future incidents could result in her termination. Thus, although Dupré's termination constituted a greater punishment than DeJohnnette's three-day suspension and ninety-day probation, Dupré's situation differed substantially from that of DeJohnnette, as Dupré was already on probation and had been warned that another infraction could result in her

termination. It is notable, however, that De-Johnnette was both suspended and placed on probation for this one error, whereas Dupré was not suspended for her previous infractions and was not placed on probation until after the second incident was reviewed. This suggests that Dupré received more favorable, rather than less favorable, treatment compared to a similarly situated employee.

 As to Dupré's claim that Harris County refused to transfer her or reduce the length of her shift, Dupré, likewise, has failed to show that she was treated less favorably than other employees. Although she makes conclusory allegations that both Aldana and Manito were transferred to less-stressful positions, she has not sustained her summary judgment burden with respect to these allegations. Dupré has not demonstrated that she formally applied for any less-stressful positions. Instead, the uncontroverted evidence reflects that she did not apply for the two posted positions that became available in late December 1994 and early January 1995 or for any position posted at Ben Taub. Gardner states that in her affidavit that the procedures for intra-departmental transfers "generally required a written request." A plaintiff alleging discrimination who fails to apply for a desired position may still establish a *prima facie* case if she shows that filing a formal application would have been a futile gesture. *See International Bhd. of Teamsters v. United States,* 431 U.S. 324, 365, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Chambers v. Wynne Sch. Dist.,* 909 F.2d 1214, 1217 (8th Cir.1990). Similarly, a plaintiff's failure to apply may be excused by "overwhelming evidence of pervasive discrimination in all aspects of [the employer's] internal employment practices." *Kreuzer v. Brown,* 128 F.3d 359, 363 n. 2 (6th Cir.1997) (quoting *Harless v. Duck,* 619 F.2d 611, 617–18 (6th Cir.), *cert. denied,* 449 U.S. 872, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980)), *cert. denied,* —— U.S. ——, 118 S.Ct. 1802, 140 L.Ed.2d 941 (1998); *see Monfort, Inc. v. NLRB,* 965 F.2d 1538, 1546 (10th Cir.1992). Dupré, however, has made neither showing.

Moreover, the unrefuted evidence indicates that the transfers about which Dupré complains took place well after her departure. In her affidavit, Dupré vaguely asserts that Aldana and Manito's alleged transfers occurred "around the same time that I requested such a transfer." Gardner's affidavit, however, establishes that Aldana's transfer occurred approximately four months after Dupré's alleged request for transfer, and about three months after her termination. Similarly, Gardner's affidavit reveals that Manito's departure from the neonatal intensive care unit occurred nine months subsequent to Dupré's termination, after which Manito received assignments only from the nursing registry. Thus, other than Dupré's own subjective belief, there is no evidence that Manito was ever transferred. Furthermore, there is no indication that either of these alleged positions was available at the time Dupré purportedly was seeking a transfer. Additionally, no evidence has been presented concerning the reasons for the alleged transfers, whether the alleged transferees formally applied for the positions, or whether Ben Taub initiated the alleged transfers. Likewise, Dupré does not contend that she was more qualified than Aldana and Manito or that she had equal qualifications for the positions. Furthermore, there is no evidence that Aldana and Manito were not disabled.

 Finally, with respect to her request for a shorter shift, Dupré has not shown that any of her co-workers was granted a reduction in shift duration. Further, as Dupré had requested a compressed work week, requiring her to work only on weekends, any significant reduction in her shift would have resulted in her working less than a forty-hour week. It is uncontroverted, however, that Ben Taub did not have any part-time positions available. Where an employer has no part-time positions, a request for such a position is unreasonable and not required by the ADA. *See Terrell v. USAir,* 132 F.3d 621, 626 (11th Cir.1998). Similarly, an employer has no obligation to create a new "light duty" position for an employee. *See Steffes v. Stepan Co.,* 144 F.3d 1070, 1073 (7th Cir.1998); *Still,* 120 F.3d at 53; *Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 809 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998); *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1186 (6th Cir.1996) ("employers are not required to create new positions for

disabled employees in order to reasonably accommodate the disabled individual"). Nor is an employer required to implement "an accommodation that would result in other employees having to work harder or longer." *Turco*, 101 F.3d at 1094; *see Kralik v. Durbin*, 130 F.3d 76, 79 (3d Cir.1997); *Daugherty*, 56 F.3d at 700; *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124–25 (10th Cir.1995).

Thus, Dupré has not shown that she was replaced by a non-disabled person nor has she identified a similarly situated, non-disabled employee who was treated better than she. Accordingly, Dupré has failed to establish the fourth element of a *prima facie* case of discrimination under the ADA.

### 2. *Legitimate, Nondiscriminatory Reason*

▮ Even if Dupré had established a *prima facie* case of disability discrimination, Harris County has set forth an adequate, nondiscriminatory reason for its actions.

Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See St. Mary's Honor Ctr.*, 509 U.S. at 506–07, 113 S.Ct. 2742; *Sherrod*, 132 F.3d at 1122; *Messer*, 130 F.3d at 137; *Faruki v. Parsons S.I.P., Inc.*, 123 F.3d 315, 320 (5th Cir.1997); *Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 370 (5th Cir.1997). The purpose of this step is " 'to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent.' " *Stratton v. Department of the Aging*, 132 F.3d 869, 879 (2d Cir.1997) (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998)). "The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir.1998); *accord Williams*, 98 F.3d at 181; *Acevedo–Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir.1993); *Fields v. Clark Univ.*, 966 F.2d 49, 51 (1st Cir.1992), *cert. denied*, 506 U.S. 1052, 113 S.Ct. 976, 122 L.Ed.2d 130 (1993).

Hence, the defendant's burden is relatively light. *See Greenway*, 143 F.3d at 51.

"If the employer produces any evidence 'which taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action,' then the employer has satisfied its burden of production." *Daigle*, 70 F.3d at 396 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. 2742); *Texas Bus Lines*, 923 F.Supp. at 970. "The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act on or approve." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1012 n. 6 (1st Cir.1979); *see Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir.1984). Indeed, even an employer's incorrect belief that " 'an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason.' " *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir.1995) (quoting *Little v. Republic Refining Co., Ltd.*, 924 F.2d 93, 97 (5th Cir.1991)). The articulated reason, however, must be "clear and specific." *Gallo v. Prudential Residential Servs. Ltd. Partnership*, 22 F.3d 1219, 1226 (2d Cir.1994). Furthermore, it "must be legally sufficient to justify a judgment for the [employer.]" *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 160 (1st Cir.1998) (quoting *Burdine*, 450 U.S. at 255, 101 S.Ct. 1089); *see Nichols*, 81 F.3d at 41; *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 992 (5th Cir.1996). If the defendant sustains it burden of production, "the presumption raised by the plaintiff's prima facie case essentially disappears, and the plaintiff is left with the ultimate burden." *Tanik v. Southern Methodist Univ.*, 116 F.3d 775, 776 (5th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 600, 139 L.Ed.2d 488 (1997); *accord Messer*, 130 F.3d at 137; *Grimes v. Texas Dep't of Mental Health & Mental Retardation*, 102 F.3d 137, 140 (5th Cir.1996).

Here, Harris County has set forth a legitimate, non-discriminatory reason for Dupré's termination. Thomas explained in her affidavit, "I terminated Ms. Dupré's employment because of the seriousness of this third act of negligence, which occurred during her proba-

tion period." In another affidavit, Thomas related that Dupré's disability played no role in her decision to terminate Dupré. Hence, Harris County has articulated a specific reason for Dupré's termination, which permits the conclusion that it was not based on a discriminatory animus, thus satisfying the burden of production.

### 3. *Pretext for Discrimination*

■■■■ Because Harris County has carried its burden of articulating a legitimate, nondiscriminatory reason for terminating Dupré, to prevail, she must prove by a preponderance of the evidence that Harris County's proffered reason is a pretext for discrimination. *See Travis v. Board of Regents,* 122 F.3d 259, 263 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1166, 140 L.Ed.2d 176 (1998); *Price,* 119 F.3d at 337. To demonstrate a "pretext for discrimination," the plaintiff must show both that the employer's stated reason for its actions is false and that prohibited discrimination was the real reason for the employer's decision. *See St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742; *Travis,* 122 F.3d at 263; *Swanson v. General Servs. Admin.,* 110 F.3d 1180, 1185 (5th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 366, 139 L.Ed.2d 284 (1997); *Louisiana Office of Community Servs.,* 47 F.3d at 1443. The evidence of pretext must be more substantial than pure speculation; a plaintiff must provide sufficiently specific reasons for her allegations of pretext. *See Nichols,* 81 F.3d at 42. "The employer, of course, will be entitled to summary judgment if the evidence taken as a whole would not allow a jury to infer that the actual reason for the discharge was discriminatory." *Rhodes,* 75 F.3d at 994; *see Price,* 119 F.3d at 337.

Here, Dupré has made no showing that Harris County's articulated reasons for its actions are false or that discrimination was actually the motivating factor. The unrefuted evidence reflects that on January 13, 1995, Dupré was placed on probation as a result of two reported incidents of negligence and unsafe nursing practices. Dupré signed the Employee Reports detailing the infractions and acknowledged that additional errors would result in further disciplinary action, including termination. Despite this warning,

Dupré was involved in another incident, the merits of which she does not contest. Her negligence in failing to perform the requisite chart checks resulted in the infant, Boyd, displaying an increased heart rate and desaturation. This incident necessitated remedial measures for Boyd, including a chest x-ray, the administration of oxygen, and medication. After an investigation, Dupré was terminated.

■■■■ Moreover, there is no evidence tying her difficulties on the job to her alleged disability. She has made no showing that Harris County's conduct toward her was directly or indirectly related to her purported disability. At most, Dupré may have presented some evidence suggesting that she was placed on probation for an infraction she did not commit. Yet, " '[w]hile an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination.' " *Nix,* 738 F.2d at 1187 (quoting *Loeb,* 600 F.2d at 1012 n. 6). In this situation, Dupré has produced no evidence, either direct or circumstantial, to support a finding of illegal disability discrimination. Therefore, she has not shown that Harris County's articulated reasons for its actions were a pretext for unlawful discrimination. Under these circumstances, it is apparent that Dupré's purported disability was neither the sole cause nor even a motivating factor in her discharge. *See Turco,* 101 F.3d at 1092; *Rizzo,* 84 F.3d at 763. Therefore, Dupré has failed to establish a cognizable claim of discrimination under the ADA.

### C. *Retaliation under the ADA*

Dupré further asserts that Harris County retaliated against her for filing a charge of discrimination with the EEOC.

The ADA prohibits discrimination against an employee who has engaged in activity protected by the Act:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or par-

ticipated in any manner in an investigation, proceeding, or heating under this chapter. 42 U.S.C. § 12203(a). "Retaliation claims are treated the same whether brought under the ADA or Title VII." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997); *see Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997); *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir.1997); *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir.1997). A plaintiff may establish a claim of retaliation under the ADA by adducing direct evidence or by using the burden-shifting framework of *McDonnell Douglas Corp. See Daigle*, 70 F.3d at 396.

To establish a *prima facie* case of retaliation, a plaintiff must show:

(1) she engaged in statutorily protected activity;

(2) she suffered an adverse employment action; and

(3) a causal connection existed between the protected activity and the adverse action.

*See Kiel v. Select Artificials, Inc.*, 142 F.3d 1077, 1079 (8th Cir.1998); *Champagne v. Servistar Corp.*, 138 F.3d 7, 12 n. 5 (1st Cir. 1998); *Sherrod*, 132 F.3d at 1122 n. 8; *Penny*, 128 F.3d at 417; *Krouse*, 126 F.3d at 500.

The plaintiff bears the initial burden of establishing a *prima facie* case of retaliation. *See Davidson*, 133 F.3d at 511. If an employee establishes a *prima facie* case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. *See Krouse*, 126 F.3d at 500. Of course, the plaintiff bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination and that a discriminatory motive was the determining factor behind the defendant's actions. *See Talanda v. KFC Nat'l Management Co.*, 140 F.3d 1090, 1998 WL 159353, at *4 (7th Cir. Apr.7, 1998); *Penny*, 128 F.3d at 417. "The ultimate issue of retaliation requires the employee to prove that the adverse employment action would not have occurred 'but for' the protected activity." *Sherrod*, 132 F.3d at 1122.

In the instant case, Dupré has not shown by direct evidence that she suffered actionable retaliation, nor has she established a *prima facie* case of retaliation. The only act of retaliation alleged by Dupré—Harris County's decision to discontinue the grievance process regarding Dupré's challenge to her termination—is not the type of adverse action covered under ADA's anti-retaliation provision. The anti-retaliation provision was "designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir.1995); *see Page*, 645 F.2d at 233; *Creswell v. Deere & Co.*, No. 96–CV–1392–P, 1997 WL 667928, at *9 (N.D.Tex. Oct.21, 1997). Ultimate employment decisions include hiring, discharging, promoting, compensating, or granting leave. *See Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 539 (5th Cir.1998); *Messer*, 130 F.3d at 135; *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). An ultimate employment decision, in itself or through its direct consequences, must effect a material change in the terms or conditions of employment. *See Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir.1997). "Although actions short of termination may constitute an adverse employment action within the meaning of the statute, 'not everything that makes an employee unhappy is an actionable adverse action.'" *Manning v. Metropolitan Life Ins. Co., Inc.*, 127 F.3d 686, 692 (8th Cir.1997) (quoting *Montandon v. Farmland Indus., Inc.*, 116 F.3d 355, 359 (8th Cir.1997) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996))). Interlocutory or mediate decisions, even those that can lead to an ultimate employment decision, are not adverse employment actions for purposes of the employment discrimination statutes. *See Mattern*, 104 F.3d at 708.

In this case, Harris County's failure to proceed with Dupré's grievance did not effect a material change in the terms of Dupré's conditions of employment, as she had already been terminated. The discontinuance of the grievance process pursuant to Harris Coun-

ty's internal policy did not have a direct impact on hiring, discharging, promoting, compensating, or granting leave. At best, it had a tangential effect on whether Dupré would be reinstated in the event she prevailed. Thus, Harris County's termination of the grievance process in deference to the EEOC's investigation did not rise to the level of an adverse employment action for purposes of the anti-retaliation provision of the ADA. Therefore, Dupré has failed to establish a *prima facie* case of retaliation under the ADA. In fact, Dupré abandoned this claim when she failed to adduce evidence on this issue in response to Harris County's motion for summary judgment.

### D. *Intentional Infliction of Emotional Distress*

#### 1. *Elements of Claim*

■ Dupré also asserts a claim for intentional infliction of emotional distress against Harris County. To prevail on this claim, Dupré must establish:

(1) the defendant acted intentionally or recklessly;

(2) the defendant's conduct was extreme and outrageous;

(3) the defendant's actions caused her emotional distress; and

(4) the emotional distress suffered by her was severe.

*See Hart,* 127 F.3d at 452; *Ward v. Bechtel Corp.,* 102 F.3d 199, 203 n. 2 (5th Cir.1997); *Burden v. General Dynamics Corp.,* 60 F.3d 213, 218 (5th Cir.1995); *MacArthur v. University of Tex. Health Ctr.,* 45 F.3d 890, 898 (5th Cir.1995); *Mattix–Hill v. Reck,* 923 S.W.2d 596, 597 (Tex.1996); *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995) (citing *Twyman v.. Twyman,* 855 S.W.2d 619, 621–22 (Tex.1993)).

While "extreme and outrageous," as used in the second element of this standard, is an amorphous phrase that escapes precise definition, there appears to be a consensus that conduct is "outrageous" if it is "atrocious" and surpasses "all possible bounds of decency," such that it is "utterly intolerable in a civilized community." *See McConathy v. Dr. Pepper/Seven Up Corp.,* 131 F.3d 558, 563 (5th Cir.1998); *MacArthur,* 45 F.3d at 898; *Ugalde v. W.A. McKenzie Asphalt Co.,* 990

F.2d 239, 243 (5th Cir.1993); *Johnson v. Merrell Dow Pharm., Inc.,* 965 F.2d 31, 33 (5th Cir.1992); *Dean v. Ford Motor Credit Co.,* 885 F.2d 300, 306 (5th Cir.1989); *Randall's Food Markets, Inc.,* 891 S.W.2d at 644. In *Dean,* the Fifth Circuit (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)) explained:

> Liability [for outrageous conduct] has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.... Generally, the case is one in which a recitation of the facts to an average member of the community would lead him to exclaim, "Outrageous."

885 F.2d at 306. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *See Ugalde,* 990 F.2d at 243; *Johnson,* 965 F.2d at 33; *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1143 (5th Cir.1991). There is no occasion for the law to intervene in every case where someone's feelings are hurt. *See id.*

Specifically, in the employment context, the Fifth Circuit, applying Texas law, has repeatedly stated that a claim for intentional infliction of emotional distress will not lie for "mere employment disputes." *See, e.g., MacArthur,* 45 F.3d at 898; *Johnson,* 965 F.2d at 33. The courts recognize that in order to manage its business properly, an employer must be able to supervise, review, criticize, demote, transfer, and discipline employees. *See id.* at 34; *Wilson,* 939 F.2d at 1143. Even actions that may be unlawful in an employment setting may not be the sort of behavior that constitutes "extreme and outrageous" conduct. *See Prunty v. Arkansas Freightways, Inc.,* 16 F.3d 649, 654 (5th Cir. 1994); *Ugalde,* 990 F.2d at 243; *Honea v. SGS Control Servs., Inc.,* 859 F.Supp. 1025, 1031 (E.D.Tex.1994); *Sebesta v. Kent Elecs. Corp.,* 886 S.W.2d 459, 462–63 (Tex.App.—Houston [1st Dist.] 1994, writ denied). "It is not enough that the defendant has acted with an intent that is tortious or even criminal." *Washington v. Knight,* 887 S.W.2d 211, 216 (Tex.App.—Texarkana 1994, writ denied).

"[T]he fact of discharge itself as a matter of law cannot constitute outrageous behavior." *Wornick Co. v. Casas*, 856 S.W.2d 732, 735 (Tex.1993) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 462 (6th Cir.1986) (no liability for intentional infliction of emotional distress where an actor does no more than insist on its legal rights)). "An employer will not be held liable for exercising its legal right to terminate an employee, 'even though he is well aware that such [action] is certain to cause emotional distress.'" *Johnson*, 965 F.2d at 34 (quoting *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 809 S.W.2d 514, 522 (Tex.App.—San Antonio 1991), *aff'd in part and rev'd in part on other grounds*, 844 S.W.2d 198 (Tex. 1992)). To hold otherwise would "wholly undermine the employment at will doctrine by subjecting employers to 'a potential jury trial in connection with virtually every discharge.'" *McKethan v. Texas Farm Bureau*, 996 F.2d 734, 742 (5th Cir.1993) (quoting *Wornick Co.*, 856 S.W.2d at 736), *cert. denied*, 510 U.S. 1046 114 S.Ct. 694, 126 L.Ed.2d 661 (1994).

Here, Dupré has not described any conduct that even approaches extreme or outrageous behavior. Not only does she fail to articulate the incidents she believes to be atrocious or outrageous, but a brief perusal of the affidavits and deposition transcript submitted in support of this claim shows that Dupré was not subjected to any actions by Harris County that could be viewed as surpassing "all possible bounds of decency." Dupré's claim is nothing more than a typical employment dispute, which, under these circumstances, does not entail the egregious behavior indispensable to an actionable claim for intentional infliction of emotional distress. No doubt, being terminated can be a traumatic experience for any employee. *See Johnson*, 965 F.2d at 34. In this instance, however, there is no indication that Harris County engaged in offensive or hostile behavior or that it denigrated, belittled, or degraded Dupré. Instead, the evidence reflects that Harris County treated Dupré in a polite and professional manner. In short, none of the conduct that Dupré describes is so vile or reprehensible as to be "utterly intolerable in a civilized community."

Moreover, Dupré has not shown that any emotional distress she may have suffered as a result of Harris County's actions was severe. For a claim of intentional infliction of emotional distress to be cognizable under Texas law, there must be "sufficient proof of severe emotional distress, wholly apart from any outrageous conduct on the defendant's part." *Tidelands Auto. Club v. Walters*, 699 S.W.2d 939, 944 (Tex.App.—Beaumont 1985, writ ref'd n.r.e.); *see Badgett v. Northwestern Resources Co.*, 818 F.Supp. 998, 1003 (W.D.Tex.1993). "Severity of distress is an element of the cause of action, not simply a matter of damages." *Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1992, writ denied); *see K.B. v. N.B.*, 811 S.W.2d 634, 640 (Tex.App.—San Antonio 1991, writ denied), *cert. denied*, 504 U.S. 918, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992).

"Emotional distress" means any highly unpleasant mental reaction such as extreme grief, shame, humiliation, embarrassment, anger, disappointment, worry, and nausea. *See Behringer v. Behringer*, 884 S.W.2d 839, 844 (Tex.App.—Fort Worth 1994, writ denied); *see also Washington*, 887 S.W.2d at 216; *Badgett*, 818 F.Supp. at 1003; *Tidelands Auto. Club*, 699 S.W.2d at 945. In order to recover damages, however, the plaintiff must prove more than mere worry, anxiety, vexation, embarrassment, or anger. *See McCray v. DPC Indus., Inc.*, 875 F.Supp. 384, 392 (E.D.Tex.1995) (citing *Regan v. Lee*, 879 S.W.2d 133, 136 (Tex.App.—Houston [14th Dist.] 1994, no writ)); *Haryanto v. Saeed*, 860 S.W.2d 913, 923 (Tex.App.—Houston [14th Dist.] 1993, writ denied). "The law intervenes only where the distress is so severe that no reasonable person should be expected to endure it." *Behringer*, 884 S.W.2d at 844 (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965)).

In this situation, Dupré does not claim to have experienced any psychiatric problems as a result of Harris County's conduct. Dupré was already experiencing depression and had been diagnosed with bipolar disorder before she was placed on probation and subsequently terminated by Harris County. While the cause of her mental problems is

unclear, Dupré contends that, when she was a child, she was raped by her former brother-in-law, who was a co-worker at Ben Taub. In any event, the record reflects that her disorder was effectively controlled by medication. Consequently, Dupré's claimed emotional distress cannot be said to be "so severe that no reasonable person could be expected to endure it." *Benavides,* 848 S.W.2d at 195.

Therefore, Dupré has failed to proffer sufficient evidence to support two of the required elements of an intentional infliction of emotional distress claim under Texas law—extreme conduct and severe distress. Indeed, Dupré abandoned this claim when she did not respond to Harris County's motion for summary judgment on this issue.

### 2. *Sovereign Immunity*

 Harris County asserts that even if Dupré had established the elements of a claim of intentional infliction of emotional distress, her claim would be barred by the doctrine of sovereign immunity.

 In Texas, under the doctrine of sovereign immunity, a governmental entity cannot be held liable for the actions of its employees unless there is a constitutional or statutory provision waiving such immunity. *See Dallas County Mental Health & Mental Retardation v. Bossley,* 968 S.W.2d 339, 340 (Tex.1998); *Harris County v. Dillard,* 883 S.W.2d 166, 168 (Tex.1994); *University of Tex. Med. Branch v. York,* 871 S.W.2d 175, 177 (Tex.1994); *Lowe v. Texas Tech Univ.,* 540 S.W.2d 297, 298 (Tex.1976); *Harrison v. Texas Bd. of Pardons & Paroles,* 895 S.W.2d 807, 809 (Tex.App.—Texarkana 1995, writ denied); *Bookman v. Bolt,* 881 S.W.2d 771, 774 (Tex.App.—Dallas 1994, writ denied). Sovereign immunity can be waived only through the use of clear and unambiguous language. *See York,* 871 S.W.2d at 177; *Duhart v. State,* 610 S.W.2d 740, 742 (Tex.1980). In the absence of a waiver, Harris County is entitled to sovereign immunity with respect to Dupré's claims. *See York,* 871 S.W.2d at 177; *City of El Paso v. W.E.B. Inv.,* 950 S.W.2d 166, 169 (Tex.App.—El Paso 1997, writ denied); *Allen v. City of Midlothian,* 927 S.W.2d 316, 322 (Tex.App.—Waco 1996, no writ).

The Texas Legislature enacted the Texas Tort Claims Act ("TTCA") to waive sovereign immunity in certain limited circumstances. *See Kerrville State Hosp. v. Clark,* 923 S.W.2d 582, 586 (Tex.1996); *York,* 871 S.W.2d at 177; *Harrison,* 895 S.W.2d at 809. The TTCA provides:

A governmental unit in the state is liable for:

(1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

(A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by the condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

Tex.Civ.Prac. & Rem.Code Ann. § 101.021. Counties, as political subdivisions of the State of Texas, fall within the parameters of the Act. *See* Tex.Civ. Prac. & Rem.Code Ann. § 101.001(2)(B); *see also McCord v. Memorial Med. Ctr. Hosp.,* 750 S.W.2d 362, 363 (Tex.App.—Corpus Christi 1988, no writ).

 For a governmental entity to be held liable for the acts of its employee under the TTCA: (1) the claim must arise under one of three specific areas of liability; and (2) the claim must not fall within an exception to the waiver of sovereign immunity. *See Alvarado v. City of Brownsville,* 865 S.W.2d 148, 155 (Tex.App.—Corpus Christi 1993), *rev'd on other grounds,* 897 S.W.2d 750 (Tex.1995); *accord City of Hempstead v. Kmiec,* 902 S.W.2d 118, 122 (Tex.App.—Houston [1st Dist.] 1995, no writ); *McKinney v. City of Gainesville,* 814 S.W.2d 862, 865 (Tex.App.—Fort Worth 1991, no writ); *see also City of Denton v. Page,* 701 S.W.2d 831, 834 (Tex. 1986); *Salcedo v. El Paso Hosp. Dist.,* 659 S.W.2d 30, 31 (Tex.1983). "The determination of a governmental entity's negligence will be made only after a claimant has

cleared these two statutory hurdles." *Alvarado,* 865 S.W.2d at 155. In order to hold Harris County liable under the TTCA, the plaintiff's injuries must have been proximately caused by the operation or use of a motor-driven vehicle or motor-driven equipment or by a condition or use of tangible real or personal property. *See Bossley,* 968 S.W.2d at 342; *Salcedo,* 659 S.W.2d at 33; *Vincent v. West Tex. State Univ.,* 895 S.W.2d 469, 472 (Tex.App.—Amarillo 1995, no writ); TEX.CIV. PRAC. & REM.CODE ANN. § 101.021. Dupré's claims do not fall under any of these categories.

Moreover, the TTCA does not waive immunity for intentional torts. *See Taylor v. Gregg,* 36 F.3d 453, 457 (5th Cir.1994); *Riggs v. City of Pearland,* 177 F.R.D. 395, 405 (S.D.Tex.1997); *Huong v. City of Port Arthur,* 961 F.Supp. 1003, 1008–09 (E.D.Tex. 1997); *Delaney v. University of Houston,* 835 S.W.2d 56, 58 (Tex.1992); *Kmiec,* 902 S.W.2d at 122; *City of San Antonio v. Dunn,* 796 S.W.2d 258, 261 (Tex.App.—San Antonio 1990, writ denied). In fact, intentional torts are specifically exempted from the coverage of the TTCA. The statute provides:

This chapter does not apply to a claim:

(1) based on an injury or death connected with any act or omission arising out of civil disobedience, riot, insurrection, or rebellion; or

(2) arising out of assault, battery, false imprisonment, or any other intentional tort, including a tort involving disciplinary action by school authorities.

TEX.CIV.PRAC. & REM.CODE ANN. § 101.057. "This limitation provides that claims 'arising out of assault, battery, false imprisonment, or any other intentional tort' are not actionable" under the TTCA. *McCord,* 750 S.W.2d at 363; *see Riggs,* 177 F.R.D. at 405; *Callis v. Sellars,* 953 F.Supp. 793, 801 (S.D.Tex.1996); *Dunn,* 796 S.W.2d at 261. Thus, Harris County is immune from liability for Dupré's claim of intentional infliction of emotional distress.

### III. *Conclusion*

In summary, Dupré has not adduced sufficient evidence to defeat Harris County's motion for summary judgment. There are no outstanding issues of material fact with regard to her claim of disability discrimination, as she has failed to show that she has a disability cognizable under the ADA or that she was treated adversely compared to non-disabled employees. Dupré also has made no showing that her disability was the cause of her termination. She, likewise, has not shown that she suffered an adverse ultimate employment decision in retaliation for engaging in activity protected under the ADA. Additionally, Dupré has failed to establish a *prima facie* case of intentional infliction of emotion distress under Texas law and, in any event, her claim is barred by the doctrine of sovereign immunity.

Therefore. Dupré has failed to present a claim that would entitle her to relief, and Harris County is entitled to judgment as a matter of law. Accordingly, Harris County's motion for summary judgment is GRANTED.

IT IS SO ORDERED.