**James R. PENNY, Plaintiff–Appellant,**

v.

**UNITED PARCEL SERVICE,
Defendant–Appellee.**

No. 96–3890.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 8, 1997.

Decided Oct. 22, 1997.

Ivan L. Tamarkin (argued and briefed), Cincinnati, OH, for Plaintiff–Appellant.

Michael C. Lueder (argued and briefed), Kerry P. Hastings, Taft, Stettinius & Hollister, Cincinnati, OH, for Defendant–Appellee.

Before: LIVELY, KENNEDY, and NORRIS, Circuit Judges.

LIVELY, Circuit Judge.

The plaintiff, James R. Penny, appeals from the district court order granting the defendant's motion for summary judgment in this case brought under the Americans with Disabilities Act (ADA). The defendant, United Parcel Service (UPS), moved for dismissal in the district court for lack of subject matter jurisdiction and now seeks dismissal of this appeal on that ground. Upon consideration, this court concludes that we do have jurisdiction over the appeal and that the defendant was entitled to summary judgment. Accordingly, we affirm the judgment of the district court.

### I.

### A.

The plaintiff began working for UPS as a package car driver in 1976. In 1991 he injured his shoulder and back while lifting the rear door of one of UPS's familiar brown trucks and was placed on temporary total disability for nine months. Penny collected workers' compensation benefits during this period. Dr. Winston, an orthopedic surgeon, diagnosed the plaintiff as having lumbar strain, tendinitis of the right shoulder, and sprain of the right shoulder. After returning to work on November 18, 1991, Penny continued to experience intermittent shoulder and back pain.

The plaintiff suffered a second injury on January 15, 1993, when he was involved in an automobile accident. For several weeks following this accident, Dr. Kremchek treated the plaintiff for whiplash before allowing the plaintiff to return to work without any restrictions on February 16, 1993. Throughout this period, the plaintiff continued to receive treatment from Dr. Winston for back and shoulder pain. On June 2, 1993, Dr. Winston gave the plaintiff a disability certificate stating that until September 6 "Patient is to be put on a shorter route with less boxes due to re-current R[ight] shoulder tendonitis." Mr. Penny claims that his manager at UPS, Keith Prater, ignored this medical restriction and assigned him to "run the heavy business/industrial route of Mark Robbins when the extended, country route of Mike Woods was available." The defendant counters that the disability certificate was "nonsensical" because the shorter delivery routes require the delivery of more, not fewer, packages (e.g., a route that includes only one large building).

The plaintiff filed a written grievance with his union on June 10, 1993, requesting that the company honor the disability certificate. The parties quickly settled the grievance in an oral understanding that the plaintiff would be assigned lighter routes whenever possible and, more specifically, that the plaintiff would "run" Mike Wood's route any time that Wood was absent. The plaintiff subsequently requested other "reasonable accom-modations." On July 20, he asked UPS to provide him with a delivery truck equipped with power steering and reiterated his request that he be assigned the "lightest route possible." In 1994, after watching a company video showing how to handle heavy packages using rollers and "two wheelers," the plaintiff requested that UPS provide him with these aids to facilitate his delivery of packages. Mr. Penny argues that UPS refused to accommodate his needs and ignored the terms of the grievance settlement. He claims, for instance, that the company failed to assign him Mike Wood's route or other light routes which were available on the following dates: 7/7/93, 10/6/93, 10/7/93, 10/8/93, 10/15/93, 10/19/93, 10/20/93, 10/21/93, 10/22/93, 10/27/93, and 12/17/93. Furthermore, the plaintiff contends that UPS failed to grant his other requests for "reasonable accommodations" in order to retaliate against him for his decision to file the grievance. UPS, in turn, argues that Penny generally was assigned routes that were lighter than his normal route—despite the company's belief that Penny was not disabled and that his request for lighter assignments was not a reasonable accommodation.

Penny sustained a third injury on March 17, 1994, while delivering a heavy package. Penny first obtained treatment for this shoulder and back injury from Dr. Winston but then sought a second opinion from Dr. Autry on May 3, 1994. Dr. Autry diagnosed lumbar strain syndrome, rotator cuff tendinitis, and anterior impingement of the right shoulder. Due to the persistent nature of these injuries, Dr. Autry performed surgery on the plaintiff's shoulder. After recovering from the surgery, the plaintiff entered a "work hardening" program, which he completed in 1995. Penny then felt prepared to return to work. Penny did, in fact, return to work on June 26 and assisted another UPS driver for four days. On the morning of the fifth day, UPS District Labor Manager Mike Vercheak sent the plaintiff home for 12 days, stating that the company needed time to review whether the appropriate paperwork had been completed to allow the plaintiff to return to work. The plaintiff eventually received back-pay for this period. He continues to work for UPS and apparently has been satis-

fied with his working conditions since his return to work in 1995.

### B.

On March 16, 1995 (prior to his return to work after his last injury), the plaintiff filed this suit charging that UPS had discriminated against him in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Ohio's Fair Employment Practice Act, Ohio Rev.Code Ann. § 4112.01 *et seq.* In his complaint, the plaintiff alleged that UPS violated these anti-discrimination statutes by failing to accommodate his disabilities in 1993 and 1994. In particular, Mr. Penny stated that UPS refused to comply with the terms of his 1993 grievance settlement (lighter delivery routes) and refused to provide him with a dolly, cart, and vehicle with power steering. As an alternative theory of recovery, the complaint alleged that UPS took these actions in retaliation for Penny's decision to file the 1993 grievance. The plaintiff later amended his complaint to add a second retaliation claim, contending that the twelve-day delay in his return to full-time work in June 1995 amounted to retaliation for the filing of this lawsuit. He sought damages for loss of income from UPS's refusal to permit him to return to work when he was ready following the March 1994 injury, for emotional stress based on the same refusal, and for exacerbating his injury by failing to grant him a reasonable accommodation.

The district court ultimately granted the defendant's motion for summary judgment on the federal and state law failure to accommodate claims upon finding that the plaintiff was not disabled. In the alternative, the court ruled that the plaintiff was not entitled to relief because he "could not perform the essential functions of his job, i.e. delivering packages on [his assigned] route." Finally, the court rejected the plaintiff's retaliation claims because the plaintiff failed to make a prima facie showing of retaliation and because, in any event, the defendant offered a legitimate, non-discriminatory reason for delaying the plaintiff's return to full-time status in 1995.

The district court entered its final judgment on July 16, 1996, and the plaintiff filed a timely appeal.

### II.

UPS bases its subject matter jurisdiction argument on the fact that the collective bargaining agreement covering Penny's employment provides for arbitration of ADA claims. Penny argues that he followed the grievance procedures when UPS failed to recognize his disabilities and that the matter was settled. After that, he contends, UPS retaliated against him, and argues that there is no arbitration recourse for retaliation.

### A.

UPS relies almost entirely on a recent opinion of the United States Court of Appeals for the Fourth Circuit in arguing that the court has no jurisdiction. See *Austin v. Owens–Brockway Glass Container, Inc.,* 78 F.3d 875, *cert. denied,* —— U.S. ——, 117 S.Ct. 432, 136 L.Ed.2d 330 (1996). In *Austin,* the court discussed two Supreme Court decisions dealing with the question of arbitration as opposed to judicial determination of claims by employees that their employers discriminated against them in violation of federal civil rights statutes. See *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), and *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).

In *Gardner–Denver* the Court held that a prior arbitral decision does not divest federal courts of jurisdiction over actions brought by employees under Title VII of the Civil Rights Act of 1964. 415 U.S. at 47, 94 S.Ct. at 1019. Rather, the purpose and procedures of Title VII "strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under the nondiscrimination clause of a collective-bargaining agreement." *Id.* at 49, 94 S.Ct. at 1020. The Court recognized the federal policy favoring arbitration, but concluded that this policy and the federal policy against discrimination in employment practices "can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration

clause of a collective-bargaining agreement and his cause of action under Title VII." *Id.* at 59–60, 94 S.Ct. at 1025.

In *Gilmer* the question was "whether a claim under the Age Discrimination in Employment Act ... can be subjected to compulsory arbitration pursuant to an arbitration agreement in a securities registration application." 500 U.S. at 23, 111 S.Ct. at 1650. The Supreme Court held that claims under federal civil rights statutes may be the subject of an arbitration agreement, enforceable pursuant to the Federal Arbitration Act. Because Congress did not preclude arbitration as a means of enforcing the Age Discrimination in Employment Act, the Court concluded that Gilmer's voluntary agreement to arbitrate, entered into at the time of his employment, was binding on him.

The *Gilmer* Court did not overrule *Gardner–Denver*, but distinguished it and "its progeny" as follows:

> First, those cases did not involve the issue of the enforceability of an agreement to arbitrate statutory claims. Rather, they involved the quite different issue whether arbitration of contract-based claims precluded subsequent judicial resolution of statutory claims. Since the employees there had not agreed to arbitrate their statutory claims, and the labor arbitrators were not authorized to resolve such claims, the arbitration in those cases understandably was held not to preclude subsequent statutory actions. Second, because the arbitration in those cases occurred in the context of a collective-bargaining agreement, the claimants there were represented by their unions in the arbitration proceedings. An important concern therefore was the tension between collective representation and individual statutory rights, a concern not applicable to the present case. Finally, those cases were not decided under the FAA, which, as discussed above, reflects a "liberal federal policy favoring arbitration agreements."

*Id.* at 35, 111 S.Ct. at 1657 (internal citations omitted).

**B.**

UPS relies on the terms of two agreements with the Teamsters Union, the "National Master United Parcel Service Agreement" (National Agreement) and the "Central Conference Supplemental Agreement to the National Master United Parcel Service Agreement" (Supplemental Agreement). Grievances are considered first under the Supplemental Agreement. Under that agreement, grievances that are not settled at the first, informal step are presented to a Joint Area Committee. If not settled at that step, grievances are referred to a UPS vice-president (or designee) and the international director of the Teamsters' Central Conference (or designee). Art. 5, Sec. 3 of the Supplemental Agreement then provides:

> Their decision shall be final and binding on all parties and employees involved. If they are unable to agree, either party shall be permitted all legal and economic recourse, including the right of the Union to strike and the right of the Employer to lock out.

> Cases which are deadlocked by the final step of the JAC may, by majority vote, be referred to the National Grievance Committee.

The National Agreement provides that in the case of a deadlock, either the union or the employer has the right to refer the case to binding arbitration. The arbitrator is to be selected from the American Arbitration Association "national panel list." Article 36 of the National Agreement states that UPS will not discriminate against any employee on the basis of a handicap and, more particularly, states: "This Article also covers employees with a qualified disability under the Americans with Disabilities Act." Both agreements provide that the grievance procedures may be invoked only by union or employer representatives, not by individual employees.

**C.**

We believe this case is controlled by *Gardner–Denver* rather than by *Gilmer*. The Supreme Court made it clear in *Livadas v. Bradshaw*, 512 U.S. 107, 114 S.Ct. 2068, 129

L.Ed.2d 93 (1994), that there is no inconsistency between the two decisions, and that *Gardner–Denver* was not overruled by *Gilmer.* The *Livadas* Court stated:

> In holding that an agreement to arbitrate an Age Discrimination in Employment Act claim is enforceable under the Federal Arbitration Act, *Gilmer* emphasized its basic consistency with our unanimous decision in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), permitting a discharged employee to bring a Title VII claim, notwithstanding his having already grieved the dismissal under a collective-bargaining agreement. *Gilmer* distinguished *Gardner–Denver* as relying, *inter alia,* on: the "distinctly separate nature of ... contractual and statutory rights" (even when both were "violated as a result of the same factual occurrence"), 415 U.S. at 50, 94 S.Ct. at 1020; the fact that a labor "arbitrator has authority to resolve only questions of contractual rights," *id.* at 53–54, 94 S.Ct. at 1022; and the concern that in collective-bargaining arbitration, "the interests of the individual employee may be subordinated to the collective interests of all employees in the bargaining unit," *id.* at 58 n. 19, 94 S.Ct. at 1024 n. 19.

512 U.S. at 127 n. 21, 114 S.Ct. at 2080 n. 21.

Despite these significant differences between *Gardner–Denver* and *Gilmer,* the divided panel of the Fourth Circuit that decided *Austin* concluded that the "old law" of *Gardner–Denver* was no longer controlling. 78 F.3d at 882 ("To decide otherwise, we would have to hold that *Gilmer* has no effect at all and that *Alexander* is still the law that statutory claims cannot be the subject of required arbitration. We do not think Congress intended to return to the old law.").

*Austin* has not inspired many followers. Indeed, Judge Hall, the dissenting panel member in *Austin,* forcefully argued that nothing about *Gilmer* alters *Gardner–Denver*'s holding that a "labor union may not prospectively waive a member's individual right to choose a judicial forum for a statutory claim." *Id.* at 886. Within the last two months, moreover, the Eleventh Circuit explicitly rejected the "result and reasoning of the Fourth Circuit" in *Austin,* finding Judge Hall's dissent more persuasive. See *Brisentine v. Stone & Webster Engineering Corp.,* 117 F.3d 519, 526 (1997). Several other circuit courts side with the Eleventh Circuit. See *Harrison v. Eddy Potash, Inc.,* 112 F.3d 1437, 1453 (10th Cir.), *petition for cert. filed,* 66 U.S.L.W. 3137 (U.S. Aug. 6, 1997) (No. 97–232) (adopting "the majority view ... that *Alexander* and its progeny remain good law and that statutory employment claims are independent of a collective bargaining agreement's grievance and arbitration procedures") (internal quotations omitted); *Pryner v. Tractor Supply Co.,* 109 F.3d 354, 363 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 294, 139 L.Ed.2d 227 (1997) (applying *Alexander* and holding that "the union cannot consent *for* the employee by signing a collective bargaining agreement that consigns the enforcement of statutory rights to the union-controlled grievance and arbitration machinery created by the agreement"); *Varner v. National Super Markets, Inc.,* 94 F.3d 1209 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 946, 136 L.Ed.2d 835 (1997); *Tran v. Tran,* 54 F.3d 115, 117–18 (2nd Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1417, 134 L.Ed.2d 542 (1996). These decisions display more fidelity to the Supreme Court's holdings in *Gardner–Denver* and *Gilmer* than does *Austin.* As Judge Hall argued, although *Gilmer* permits an *individual* to waive his prerogative to pursue a statutory right in a judicial forum, that case does not alter *Gardner–Denver*'s holding that a labor union cannot make such a waiver prospectively on an individual's behalf.

Though not previously called upon to decide the jurisdictional question now before us, this court has recognized that *Gilmer* and *Gardner–Denver* are not inconsistent and control different factual situations. See *Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305, 309 (6th Cir.1991), where the court stated:

> The Court in *Gilmer* limited, however, the scope of *Alexander* to circumstances in which the agreement to arbitrate did not include a waiver of statutory rights independent of the collective-bargaining agreement.

■ We conclude that an employee whose only obligation to arbitrate is contained in a collective bargaining agreement retains the right to obtain a judicial determination of his rights under a statute such as the ADA. Both the district court and this court have jurisdiction over Penny's claim.

## III.

This appeal presents a fairly narrow issue on the merits. The plaintiff does not contend that he is disabled from working. In fact, he is working now as a UPS package car driver. At oral argument Penny's counsel made it clear that his basic claim is that he was substantially limited in the "major life activity" of walking in 1993 and 1994 and that UPS failed to accommodate his needs following his various injuries. In addition, he seeks damages for UPS's alleged retaliation against him for his having filed a grievance in connection with his second injury.

## A.

■ The district court found that Penny was not disabled within the meaning of the Act at any time between June 3, 1993, and March 17, 1994. The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112 (Supp. V 1993). This broad remedial statute places on covered employers the affirmative duty of "making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship...." Id. § 12112(b)(5)(A). To prevail on a failure to accommodate claim, an employee must show: (1) that he is disabled; (2) that he is qualified for the job with or without reasonable accommodation; and (3) that he was denied a reasonable accommodation. *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir.1996).

The ADA defines "disability" broadly to include:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). The Equal Employment Opportunity Commission (EEOC) has promulgated regulations defining "major life activities" to include functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, breathing and working. 29 C.F.R. § 1630.2(i). Interpretive guidelines explain that the above list "is not exhaustive" and that "other major life activities include, but are not limited to, sitting, standing, lifting, [and] reaching." 29 C.F.R. Pt. 1630 App. (1966). The regulations define the phrase "substantially limits" as follows:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (1996). In deciding whether an individual is substantially limited in a major life activity, courts should consider the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or expected permanent or long term impact, of the impairment. *Id.* § 1630.2(j)(2).

## B.

■ Obviously, the first requirement that any ADA claimant must meet is to demonstrate that he or she is disabled within the meaning of the statute and regulations. We agree with the district court that Penny failed to clear this hurdle; his proof in response to the defendant's motion for summary judgment failed to create a triable issue of fact regarding whether he is

substantially limited in the major life activity of walking, the only disability he claims on appeal. Although the record clearly indicates that Penny suffers an impairment that affects to some degree his ability to walk, he has not "adduced sufficient evidence from which a factfinder reasonably could conclude that the nature and severity of his injury significantly restricted his ability to walk as compared with an average person in the general population." *Kelly v. Drexel University*, 94 F.3d 102, 105 (3rd Cir.1996).

■ We have found few cases defining what constitutes a substantial limitation on a person's ability to walk. See *Hamm v. Runyon*, 51 F.3d 721, 724 n. 3 (7th Cir.1995). What cases do exist, though, make clear that moderate difficulty or pain experienced while walking does not rise to the level of a disability. In *Kelly*, for instance, the plaintiff suffered from severe post-traumatic degenerative joint disease of the right hip, which caused him to walk slowly, especially when climbing stairs. After reviewing relevant EEOC guidelines, see 94 F.3d at 106–107, the court concluded that this impairment did not amount to a disability. In *Richardson v. William Powell Co.*, No. C–1–93–528, 1994 WL 760695 (S.D.Ohio Nov. 10, 1994), the court held that degenerative arthritis that caused a noticeable limp and difficulty climbing stairs also was not a disability under the ADA because the plaintiff failed to show how it substantially limited any major life activity. Likewise, the plaintiff in *Stone v. Entergy Services, Inc.*, Civ. A. No. 94–2669, 1995 WL 368473 (E.D.La. June 20, 1995), was found not to be disabled despite having muscle weakness, residual partial paralysis from polio, one leg longer than the other, and an approximate total body impairment of 15%. The court reasoned that:

> Although plaintiff cannot walk briskly, and has some trouble climbing stairs, I find that his ability to walk is not substantially limited nor significantly restricted. Additionally, the record clearly indicates that plaintiff's ability to work is not affected by his impairment. His deposition testimony provides that plaintiff has been employed

continuously since graduating from college, and is currently employed. *Id.* at *4. Finally, in *Penchishen v. Stroh Brewery Co.*, 932 F.Supp. 671 (E.D.Pa.1996), *aff'd*, 116 F.3d 469 (3rd Cir.1997) (Table), *cert. denied*, —— U.S. ——, 118 S.Ct. 178, —— L.Ed.2d —— (1997), a court found that a plaintiff who could walk at only one-half her normal speed following an automobile accident was not substantially limited in the major life activity of walking.

### 1.

■ Penny's deposition testimony provides little support for the claim that his impairment rises to the level of a disability. Aside from statements that "I limp on occasion" and "It hurts to do my job everyday. Sometimes it hurts to walk[,]" this testimony contains no detail about how his alleged disability hinders his ability to walk. To the contrary, the deposition indicates that the plaintiff led an active life during the relevant period of time despite his impairment. He testified that during 1993 and 1994 he was able to go fishing and hunt rabbits, squirrels, pheasant and deer. Perhaps realizing belatedly the import of these admissions, the plaintiff's attorney subsequently filed an affidavit claiming that plaintiff's hunting and fishing trips did not require him to walk. We do not consider this affidavit, however, because a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony. *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). We believe a reasonable jury would know that it is impossible to hunt rabbits, squirrels, pheasants and deer without walking. Finally, the deposition testimony explains in great detail how Mr. Penny, like the *Stone* plaintiff, was able to fulfill his job duties in a relatively satisfactory manner (which required a substantial amount of walking) during the period when his ability to walk allegedly was substantially impaired.

### 2.

Penny relies primarily on statements provided by three of his treating doctors. From

Mr. Penny's perspective, the most helpful of these is Dr. Winston's summary medical report dated February 6, 1995. After reviewing the treatment received by the plaintiff in the years following his 1991 injury, Dr. Winston stated that:

> Current diagnosis with regard to Mr. Penny is a chronic lumbar strain and tendonitis of the right shoulder. He currently has a permanent partial impairment referencing the allowed conditions of this industrial claim of 20% to the body as a whole.... He can walk for only one block without rest. He is capable of running at a slow pace for only 15 minutes.

Although one's inability to walk more than a block without rest would seem to be compelling evidence of disability, this portion of Dr. Winston's medical report is self-contradictory to the point of lacking any probative value: a person who can run at any pace for 15 minutes surely can walk more than one block. We do not believe such an inherently contradictory statement constitutes the "significant probative evidence tending to support the complaint" required to withstand a motion for summary judgment. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). The district court properly found that the plaintiff could not survive summary judgment based on this evidence because a reasonable jury could not return a verdict in Mr. Penny's favor based on such inherently unreliable evidence. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. at 2512 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to avoid summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....").

### 3.

The remainder of the medical evidence submitted by the plaintiff also fails to sustain his summary judgment burden. In one medical report, Dr. Martin Fritzhand opined that Mr. Penny "has sustained a permanent partial impairment to the body as a whole of 14%." Dr. Fritzhand also noted that the low back pain often experienced by the plaintiff increases when "he continually walk[s] up hills or steps." Neither of these conditions is sufficient as a matter of law to establish a substantial limitation on the major life activity of walking. *Kelly*, 94 F.3d at 106–107 (moderate difficulty walking or climbing stairs does not constitute a disability under the ADA); *Stone*, 1995 WL 368473 at *4 (15% total body impairment found not to constitute a disability).

Finally, the plaintiff has submitted an affidavit and medical report of Dr. Stephen T. Autry, who treated the plaintiff following his 1994 accident. Like Mr. Penny's other doctors, Dr. Autry diagnosed lumbar strain syndrome, rotator cuff tendinitis, and anterior impingement of the right shoulder, and made the following prediction: "I would estimate that [Mr. Penny] will have long term difficulties with activities such as running or walking or lifting more than 25 pounds on a repetitive basis. I would estimate his partial permanent impairment at 10%." This evidence does not support Penny's claim as defined in his amended complaint because it refers only to his medical condition after his March 1994 injury and is thus irrelevant to his condition between June 3, 1993, and March 17, 1994. And even if this were not true, Dr. Autry's report would still be insufficient to create a genuine issue of material fact. Moderate difficulties experienced while running or walking (the plaintiff has not put at issue his ability to lift packages) are not disabilities. *Kelly*, 94 F.3d at 106–107.

The district court did not err in finding that the plaintiff is not disabled. It must be remembered that he is not claiming that his impairment renders him unable to perform his duties at UPS. He is claiming disability solely on the basis of a limitation on walking during a limited time. Although the plaintiff may well experience some difficulty in walking, the probative evidence, even when viewed in the light most favorable to the plaintiff, does not raise a genuine issue of material fact as to whether the plaintiff's

impairment substantially limits his ability to walk. This being true, we need not consider whether Mr. Penny could perform the essential functions of his job, with or without accommodation, or whether UPS in fact reasonably accommodated the plaintiff.

## IV.

█ The claim of retaliation is the only remaining issue for decision. Prior to this appeal, the plaintiff's retaliation claim primarily revolved around UPS's delay of his return to full-time status in June 1995. The district court dismissed this claim because the plaintiff failed to show any causal connection between protected activity and adverse employment action and because, in any event, the defendant offered a legitimate, nondiscriminatory (and unrebutted) reason for delaying the plaintiff's return to full-time status in 1995: the employer's need "to ascertain whether the appropriate paperwork had been completed related to the Plaintiff's return to work." Mr. Penny does not challenge that decision on appeal. He does contend, though, that the district court erred in not ruling on a second aspect of his retaliation claim: whether UPS retaliated against him in 1993 and 1994 for his decision to file a union grievance by assigning him difficult delivery routes and by not providing him with a dolly, cart, and vehicle equipped with power steering.

█ The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge ... under [the ADA]." 42 U.S.C. § 12203(a). Retaliation claims are treated the same whether brought under the ADA or Title VII. *Stewart v. Happy Herman's Cheshire Bridge, Inc.,* 117 F.3d 1278, 1287 (11th Cir. 1997). To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action. If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory

reason for the adverse employment action. The plaintiff, of course, bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination. See *Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1066 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).

The plaintiff correctly points out that the district court nowhere explicitly addressed whether the defendant's actions in 1993 and 1994 might be viewed as retaliation. Quite possibly, the court felt that no further discussion was required because the plaintiff's allegations about retaliatory actions taken in 1993 and 1994 are nothing more than a reformulation of his failure to accommodate claims. Whatever the reason, the district court committed no reversible error. Because the plaintiff has not alleged—much less adduced any evidence in support of an allegation—that UPS treated him differently than other UPS drivers in regard to route assignments and the plaintiff's other requests for accommodation, the plaintiff cannot show any adverse employment action. *Henry v. Guest Services, Inc.,* 902 F.Supp. 245, 252 (D.D.C. 1995), *aff'd,* 98 F.3d 646 (D.C.Cir.1996) (Table) ("Plaintiff has presented absolutely no evidence that he was treated any differently than other employees, and thus has failed to establish a prima facie case of discriminatory retaliation.").

## V.

Although the plaintiff mentioned dismissal of his state law claim in his appellate brief, he presented no arguments seeking to overturn that action of the district court. Thus, this issue is not before us.

## CONCLUSION

Upon *de novo* review of the record, see *Terry Barr Sales Agency, Inc. v. All–Lock Co., Inc.,* 96 F.3d 174, 178 (6th Cir.1996), we conclude that the district court had jurisdiction to hear and decide this case, and that it committed no reversible error.

**AFFIRMED.**