[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1079 
Em Satterwhite was convicted in the Auburn Municipal Court of criminal trespass in the third degree, a violation of §13A-7-4, Ala. Code 1975,[1] for an incident that occurred on December 9, 2002, on the premises of Hastings Entertainment, Inc. ("Hastings"), a book and video store in Auburn. Satterwhite appealed for a trial de novo in the circuit court, and after a jury trial, was again convicted of criminal trespass in the third degree. She was sentenced to 30 days' in the county jail.
The City of Auburn claimed that Satterwhite was guilty of criminal trespass in the third degree because, it alleged, she disobeyed a lawful order and refused to leave the Hastings store after being asked to leave by Hastings's management. Satterwhite's defense was that although a Hastings manager had requested that she leave Hastings with her dog, which she says is a service animal, she was not guilty of criminal trespass in the third degree because, she argued, the request was not a lawful order under the Americans with Disabilities Act of 1990 ("ADA").
At trial, Hap Greg, a corporal with the Auburn police department, and Robin Rich, a patrol officer with the Auburn police department, testified for the prosecution. Satterwhite was the sole witness for the defense.
Cpl. Greg testified that on December 9, 2002, the Auburn police department "received *Page 1080 
a complaint from a Satterwhite subject in reference to harassment at Hastings," and he responded to the call. (R. 56.) Cpl. Greg stated that he initially thought that the call had come from someone connected with Hastings, but that when he inquired about the call upon his arrival at Hastings, the on-duty manager told him that "there's a lady back here with a dog" (R. 58) and then guided him to the store's reading area. Cpl. Greg also stated that as they walked to the back of the store, the manager told him that the dog had "urinated in the store somewhere" and that "someone [had] complained that [the dog] smelled." (R. 68.)
Cpl. Greg testified that Satterwhite was seated on a couch in the reading area, reading a magazine, and that there was a dog lying on the floor next to her. He stated that the dog had on a regular collar with a six- or eight-foot walking leash attached to the collar. Cpl. Greg testified that he told Satterwhite that there had been some complaints about her dog — "that the dog was smelly and that the dog had urinated in the store" (R. 60) — and that the management had asked her to leave. According to Cpl. Greg, Satterwhite responded, "[M]y dog does not smell." (R. 60.) Cpl. Greg then asked Satterwhite "is this some type of a service animal?" and she said, "yes." (R. 61.) However, he then asked her "what type of service does this dog give you?" (R. 61.) Cpl. Greg said that Satterwhite just sat there and stared and would not respond to any of his questions except when he asked her "Do you have any disabilities, anything this dog would assist you with?" (R. 61), at which point she told him, "You can't ask me that." (R. 61.)
Cpl. Greg testified that before December 9, 2002, he had not had any dealings with service animals other than "[o]ne of our dispatchers [had] a seeing eye dog" (R. 79); that he had not had any training regarding service animals in a place of business (R. 79); that he did not have any knowledge about service animals under the ADA or under what circumstances a service animal may be required to leave a place of business (R. 80). He testified that he was aware that "usually [service animals are] trained in some type of way." (R. 81.) Cpl. Greg also testified that on December 9, 2002, he did not "observe any urine anywhere" and he did not "smell any urine anywhere" (R. 82), but that he remembers that Satterwhite's dog "did smell." (R. 82.)
Cpl. Greg said that he "begg[ed] and plead[ed]" with Satterwhite "for about an hour" to take her dog out of the store because "[t]hey don't want you here with your dog" (R. 62), and that when "Satterwhite finally said, `I'm not leaving'" (R. 62), he told the manager to tell Satterwhite to leave the store and that if she did not leave, he would arrest her. The manager then said to Satterwhite, "Ma'am, I'm asking you, you must leave the store now." (R. 63.) Cpl. Greg testified that he "waited a few minutes and she just looked at us" (R. 63), and then he said to her, "`[Ms.] Satterwhite, I'm a police officer. The management has asked you to leave. Now, I am directing you, you must leave now or I'm going to place you under arrest.'" (R. 63.) He further testified that after he told Satterwhite this, "[s]he just stared at me. And after about two or three minutes I said, `You're under arrest for criminal trespassing. Come with me.' And I put handcuffs on her." (R. 63.)
Cpl. Greg testified that after he had placed the handcuffs on Satterwhite, she walked to his police car and he transported her to the jail. He said that Satterwhite "[w]alked just fine" to his patrol car, and that an animal-control officer was called to come pick up Satterwhite's dog. (R. 64.) *Page 1081 
Cpl. Greg stated that Satterwhite did not inform him that she was disabled until after he had placed her under arrest and transported her to the police station for processing.
Officer Rich testified that when he arrived at Hastings on the evening of December 9, 2002, Cpl. Greg was already at the scene, speaking with a Hastings employee and Satterwhite. Officer Rich stated that he heard Cpl. Greg tell Satterwhite that there had been some complaints about the dog being in the store; — the dog had an "odor or [the dog] had urinated on something" (R. 95) — and that the store's management had requested that she leave the store. He testified that Satterwhite's initial response was that "she needed the dog" (R. 91), and that
 "[Cpl. Greg] questioned [Satterwhite] when she said she needed the dog. He asked if it was a service animal; asked if the dog performed any function for her; [asked] if she had any health problems that would require a service animal. And at about that point, she just quit talking to him. She just sat there stone-faced and didn't speak to him any more after that."
(R. 91.) Officer Rich testified that he heard the manager ask Satterwhite to leave; that Satterwhite "just sat there" (R. 92); that Cpl. Greg told Satterwhite that she needed to leave because she had been asked to leave and that if she did not leave, she would be arrested; that Satterwhite continued to sit there without saying a word; and that Cpl. Greg arrested Satterwhite for criminal trespass. Officer Rich stated that they were at Hastings for "quite some time" that evening (R. 95) and that he estimated that they were there for approximately "45 minutes to an hour." (R. 95.) Officer Rich said that after Satterwhite's arrest, he remained outside with the dog for 10 to 20 minutes until the animal-control officer arrived and took possession of the dog.
On cross-examination, Officer Rich testified that he did not observe or smell any urine (R. 95), and that he "didn't notice any" odor from Satterwhite's dog. (R. 95-96.) He also stated that he did not observe Satterwhite's dog bark or try to bite anyone. (R. 96.)
In her defense, Satterwhite testified that in 2000 the arthritis in her knees became worse, and she was diagnosed with fibromyalgia and diffused pain syndrome. Satterwhite said that she applied for Social Security disability benefits in 2001 after her doctor had told her that she could no longer work or go to school and that she was approved to receive Social Security disability benefits. However, Satterwhite did not elaborate as to why her doctor told her that she could not work or go to school and she did not elaborate as to the nature of the Social Security disability determination. Satterwhite stated that she researched what was required for an animal to be classified as a service animal and learned that it was not necessary for the animal to be trained at a school. She stated that she trained Dingo, a mixed-breed dog that had originally been the family's pet, to assist her with the problems she was experiencing and that Dingo began working as her service animal in 2001.
Satterwhite stated that at the time of the incident at Hastings in December 2002, she was on "[s]everal kinds of medication for [her] arthritis and knees" and that even though she was taking "about 40 pills at day" (R. 109), she was still having problems with her knees and joints and she was having problems "getting around." (R. 109.) She also testified that although "[i]t was difficult for [her] to get around, [she] was moving around better because [she] had Dingo." (R. 119.) Satterwhite *Page 1082 
said that in December 2002, Dingo "helped [her] get up and down and helped [her] to move around" (R. 110) and that "without the assistance of Dingo" she was not "able to get up and just walk around like nothing was wrong." (R. 119-20.)
Satterwhite stated that she went to Hastings on December 9, 2002, to see if a book she had ordered had come in, and that she had been to Hastings before with Dingo many times and had never been asked to leave. However, when she walked in the door of Hastings on December 9, 2002, Satterwhite said, a man who identified himself as the manager told her that she could not bring her service animal into the store because food was being sold there and the dog's presence would constitute a health-code violation. Satterwhite testified that although she told the manager that Dingo was a service animal, he said that it did not matter. Satterwhite then told the manager that she was there to check on a book order and then proceeded to the book department. According to Satterwhite, the person in the book department told her that she needed to get the dog out of there or she would be arrested.
Satterwhite testified that at that point she used her cellular telephone to call the police and tell them that she was a disabled person in a store with her service animal, that she was being threatened, and that she would like some assistance. About 15 minutes later, Satterwhite said, she received a telephone call from the police dispatcher, who asked where in the store she was located. Thereafter, two police officers and the assistant manager of Hastings came back to where she was sitting, and one of the police officers asked her if there was some reason that she needed a service animal. Satterwhite testified that she told the police officer that he could not ask questions about her personal health, but that he could ask what type of service the dog provided, and that she "went on to tell [the police officer] that [the dog] was a mobility-assistance animal." (R. 117.) Satterwhite stated that she did not go into any detail about what a mobility-assistance animal does because the police officer did not seem receptive to what she was telling him. Satterwhite denied that she sat there stone-faced, refusing to answer questions posed by the police officer. However, she admitted that she refused to answer the question regarding her personal medical condition. Satterwhite testified that she volunteered information to the police officers and even told them that the information she was providing could be verified on the Department of Justice, Americans with Disabilities Act Web site. Satterwhite stated that only about 10 minutes passed between the time the police officer began to speak to her and the time he arrested and handcuffed her and that Cpl. Greg seemed eager to place her under arrest.
Satterwhite stated that the police officer also told her that he could ask her about anything he wanted and that she was violating the health code by having the dog in the store. Satterwhite said that she told the officer that she had spoken with someone from the state health department regarding service animals and the health code and that it was not a violation of the health code for her to have a service animal in a business that served food. She stated that the officer then told her that she was "just a selfish little girl who thought that the laws didn't apply to [her] and that [she] could take [her] dog anywhere" and that if she did not leave the store at once, he would arrest her. (R. 119.)
Satterwhite testified that Dingo neither urinated anywhere in the store nor caused a foul odor, and that she did not growl or *Page 1083 
bark at anyone. Satterwhite also stated that, in fact, she had to ask two people not to pet Dingo because she was a service animal, not a pet.
 I.
At trial, Satterwhite submitted six proposed jury instructions regarding the ADA and the use of a service animal, and she argued that those proposed instructions were relevant in this case because the jury needed to have some understanding of the ADA in order to understand the basis of her defense. The trial court stated that it was refusing the requested instructions because they "are all abstract statements of law that are not related to this case." (R. 141.)
After the jury had retired for deliberations, it sent out a note with the following question: "Does dog or ADA factor into this decision?" (R. 157.) The trial court answered this question in the negative, stating that Satterwhite had not presented any "evidence at all of what the ADA says" and that she had not brought "any kind of expert in to testify about the divisions of [the] ADA that might have prevented a criminal trespass from being a legal charge in this case." (R. 158.) Satterwhite's attorney objected, stating that the ADA was "the crux of our defense" — that based on the ADA "[Satterwhite] didn't disobey a lawful order" and that "we wouldn't need an expert in this case because that's the federal law." (R. 158.)
On appeal, Satterwhite contends that the trial court erred in refusing her proposed jury instructions regarding the ADA and that the ADA did not apply to this case. (Issues I and II in Satterwhite's brief.)
An accused has the right to have the jury charged on "`any material hypothesis which the evidence in his favor tends to establish.'" Ex parte Stork, 475 So.2d 623, 624
(Ala. 1985). "`In determining whether an instruction was supported by the evidence the question is not whether the Supreme Court or Court of Criminal Appeals believes the evidence, but simply whether such evidence was presented.'"Id. "[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility." Exparte Chavers, 361 So.2d 1106, 1107 (Ala. 1978). "`"It is a basic tenet of Alabama law that `a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, . . . and the [trial] court's failure to give those instructions is reversible error."'" Ex parte McGriff,908 So.2d 1024, 1035 (Ala. 2004), quoting Winner Int'l Corp. v. CommonSense, Inc., 863 So.2d 1088, 1091 (Ala. 2003), quoting in turn other cases. "In order to determine whether the evidence is sufficient to necessitate an instruction and to allow the jury to consider the defense, we must view the testimony most favorably to the defendant." Ex parte Pettway,594 So.2d 1196, 1200 (Ala. 1991). Thus, the dispositive question here is whether, viewing the evidence in the light most favorable to Satterwhite, Satterwhite presented sufficient evidence to necessitate jury instructions on the ADA.
In 1990, Congress passed the ADA. The following is the stated purpose of the ADA:
 "(b) Purpose
 "It is the purpose of this chapter —
 "(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; *Page 1084 
 "(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;
 "(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and
 "(4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities."
42 U.S.C. § 12101(b).
Under the provisions of the ADA,
 "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."
42 U.S.C. § 12182(a).
The ADA defines the term "disability" as:
 "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
 "(B) a record of such an impairment; or
 "(C) being regarded as having such an impairment."
42 U.S.C. § 12102(2).
In Bragdon v. Abbott, 524 U.S. 624, 631,118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the United States Supreme Court set out a three-step inquiry to determine whether a particular condition falls within the definition of a disability under42 U.S.C. § 12101(2)(A). First, it must be determined whether the condition is a physical or mental impairment. Second, the affected life activity must be identified and it must be determined whether the affected life activity "constitutes a major life activity under the ADA." Bragdon,524 U.S. at 631, 118 S.Ct. 2196. Third, it must be determined whether "the impairment substantially limited the major life activity."Bragdon, 524 U.S. at 631, 118 S.Ct. 2196.
The ADA does not define the terms "substantially limits" or "major life activities." However, the "courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ('EEOC') for guidance." Gordon v. E.L. Hamm Assocs., Inc., 100 F.3d 907, 911 (11th Cir.1996). InSutton v. United Air Lines, Inc., 527 U.S. 471,119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the United States Supreme Court stated that the EEOC regulations define the elements of a "disability" in the following manner:
 "[A] `physical impairment' includes `[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.' [29 C.F.R.] § 1630.2(h)(1). The term `substantially limits' means, among other things, `[u]nable to perform a major life activity that the average person in the general population can perform'; or `[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can *Page 1085 
perform that same major life activity.' § 1630.20). Finally, `[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.' § 1630.2(I)."
527 U.S. at 479-80, 119 S.Ct. 2139.
 "The definition of disability also requires that disabilities be evaluated `with respect to an individual' and be determined based on whether an impairment substantially limits the: `major life activities of such individual.' [42 U.S.C.] § 12102(2). Thus, whether a person has a disability under the ADA is an individualized inquiry. See . . . 29 CFR pt. 1630, App. § 1630.2(j) ('The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual')."
527 U.S. at 483, 119 S.Ct. 2139 (emphasis added).
 "In deciding whether an individual is substantially limited in a major life activity, courts should consider the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long term impact, or expected permanent or long term impact, of the impairment. [29 C.F.R.] § 1630.2(j)(2)."
Penny v. United Parcel Serv., 128 F.3d 408, 414 (6th Cir.1997).
"[T]he first requirement that any ADA claimant must meet is to demonstrate that he or she is disabled within the meaning of the statute and regulations." Penny, 128 F.3d at 414.
 "A physical impairment, standing alone, is not necessarily a disability as contemplated by the ADA. The statute requires an impairment that substantially limits one or more of the major life activities."
Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 726 (5th Cir.1995). "[Individuals . . . claiming the Act's protection[ ] [must] prove a disability by offering evidence that the extent of the limitation in terms of their own experience . . . is substantial." Albertson's, Inc. v. Kirkingburg,527 U.S. 555, 567, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). "[M]oderate difficulty or pain experienced while walking does not rise to the level of a disability." Penny,128 F.3d at 415.
 "Although the record clearly indicates that Penny suffers an impairment that affects to some degree his ability to walk, he has not `adduced sufficient evidence from which a factfinder reasonably could conclude that the nature and severity of his injury significantly restricted his ability to walk as compared with an average person in the general population.' Kelly v. Drexel University, 94 F.3d 102, 105 (3rd Cir.1996)."
Penny, 128 F.3d at 415. See also Albertson's,527 U.S. at 567, 119 S.Ct. 2162 (noting that the United States Court of Appeals for the Ninth Circuit "did not identify the degree of loss suffered by Kirkingburg, nor are we aware of any evidence in the record specifying the extent of [Kirkingburg's] visual restrictions").
Federal regulations implementing the ADA state that "[g]enerally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability."28 C.F.R. § 36.302(c)(1).
 "Service animal means any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing *Page 1086 
to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items."
28 C.F.R. § 36.104.
There is no doubt that Hastings is a "public accommodation" within the meaning of the regulations. See28 C.F.R. § 36.104, defining "public accommodation" and "place of public accommodation." However, by seeking to invoke the protections of the ADA, Satterwhite had to present evidence showing that her ability to walk or move about was substantially and significantly restricted by her impairment, so that a service animal was needed to assist her with mobility.[2] SeePenny, 128 F.3d at 414-15 (finding that Penny had failed to establish that his impairment rose to the level of a disability under the ADA as there was no testimony concerning how the impairment hindered his ability to walk — the only statements Penny made during his deposition were "`I limp on occasion'" and "`[i]t hurts to do my job everyday'" and "`[s]ometimes it hurts to walk'"); Kelly v. DrexelUniv., 94 F.3d 102, 105-08 (3d Cir.1996) (finding that while Kelly is impaired, he did not establish he was disabled — during his deposition, Kelly testified that he believed that "he could not walk `more than a mile or so' and that he `certainly couldn't jog,'" and that when climbing stairs, he would "`have to pace [him]self slower, and [he] would, naturally, hold onto the rail'"); Talk v. Delta Airlines,Inc., 165 F.3d 1021, 1025 (5th Cir.1999) (finding that while Talk had some impairment in her ability to walk, it did not meet the criteria for a disability under the ADA — Talk stated that she "`walk[s] with a limp and move[s] at a significantly slower pace than the average person'" and that "extreme cold causes her difficulty in walking"); and Moorev. J.B. Hunt Tramp., Inc., 221 F.3d 944, 951 (7th Cir.2000) (finding that Moore's limitations did not meet the criteria for a disability under the ADA — Moore stated during his deposition that he "`consistently'" walked distances of less than a mile, that a mile walk "`wouldn't be any problem as long as [he's] paying attention to what [he's] doing,'" and that his arthritis affected the "`rate and pace'" of his activities as opposed to his ability to perform the activities).
Satterwhite testified that she had been diagnosed with arthritis, fibromyalgia, and diffused pain syndrome; that her doctor told her that she could no longer work or go to school; that she had been approved for Social Security disability benefits; that at the time of the incident at Hastings in December 2002, she was having problems with her knees and joints and she was having problems "getting around" even though she was taking "about 40 pills a day" (R. 109); that Dingo was her service animal; that "[i]t was difficult for [her] to get around [but she] was moving around better because [she] had Dingo" (R. 119); that Dingo "helped [her] get up and down and helped [her] to move around" (R. 110); and that "without the assistance of Dingo" she was not "able to get up and just walk around like nothing was wrong." (R. 119-20.) Although Satterwhite's defense to the trespass charge was that she was covered by the ADA and that the request of the *Page 1087 
Hastings manager that she leave the premises with her service animal was not a lawful order, our review of the record reveals that Satterwhite did not present sufficient evidence during her trial indicating that she was, in fact, covered by the ADA.
The fact that a person has been diagnosed with an impairment is not determinative as to whether :hat person is disabled under the ADA. Therefore, the fact that Satterwhite testified that she suffered from arthritis and had been diagnosed with fibromyalgia and diffused pain syndrome was not sufficient to establish that she fell within the ADA. Sutton,527 U.S. at 483, 119 S.Ct. 2139. Furthermore, Satterwhite's description of her limitations — that she was having problems with her knees and joints and having problems "getting around" (R. 109) — was vague and did not provide any details as to exactly how her impairment substantially limited her mobility. It is not uncommon for an individual suffering from arthritis to experience problems "getting around." However, "moderate difficulty experienced while walking does not rise to the level of a disability." Talk,165 F.3d at 1025. Satterwhite did not present any evidence showing that any of her conditions impaired her ability to walk or to move about to such an extent that she was either unable to walk or move about or was significantly restricted in her ability to walk or move about as compared with the average person.
Although Satterwhite testified that her doctor had told her that she could no longer work or go to school and that she had been approved to receive Social Security disability benefits, she did not provide any other details regarding why her doctor had told her that she was no longer able to work or to go to school or why she was approved to receive Social Security disability benefits.[3] The fact that the Social Security Administration ("SSA") decided to grant disability benefits to Satterwhite also does not necessarily mean that she has a disability that comes within the ADA, i.e., a substantial limitation in her ability to walk or move about, for which a trained service animal would be needed. See Weigel v.Target Stores, 122 F.3d 461 (7th Cir.1997).[4] There was no evidence presented indicating that Satterwhite's doctor had told her that she could no longer work or go to school or that the basis for her receiving Social Security disability benefits was causally related to the fact that she was experiencing some problems "getting around." (R. 109.) Satterwhite did not specifically testify, or present any evidence to show, that her doctor had told her that she could not work or go to school because of her arthritis, fibromyalgia, or diffused pain syndrome, and she did *Page 1088 
not specifically testify, or present any evidence to show, that she was awarded Social Security disability benefits because of these specific conditions.[5]
However, even assuming that the trial court and the jury could have reasonably inferred from Satterwhite's testimony that her doctor's statements concerning work and school and the determination by the SSA that she was entitled to disability benefits were based on the fact that she has arthritis and fibromyalgia and suffers chronic pain, neither the trial court nor the jury could have found that the doctor's statements and the SSA's findings were based on the fact that Satterwhite's ability to walk or move about was substantially impaired, at least without resorting to pure speculation. Under the standard of review that governs our resolution of this issue, this Court is required to view the evidence in the light most favorable to Satterwhite and to determine whether the evidence was sufficient to create a reasonable inference that at the time of the incident she was suffering from a disability as defined by the ADA, and that she needed a service animal to assist her in coping with that disability. The evidence presented at trial indicates that Satterwhite does indeed suffer from several physical impairments that might very well render her disabled within the meaning of the ADA. However, it would have required pure speculation on the part of the trial court and the jury based on the limited evidence presented at trial to find that Satterwhite had a disability that substantially limited hermobility and required the assistance of a service animal.
The evidence presented in this case does not create the reasonable inference that would be necessary for this Court to hold the trial court in error for refusing at least some of the requested instructions.[6]
Given the state of the record — specifically that Satterwhite presented no evidence that tended to establish that she needed a service animal to assist her with a disability covered by the ADA at the time of the December 2002 incident at Hastings — we hold that the trial court did not err in refusing her proposed jury instructions regarding the ADA and in telling the jury that the ADA did not apply to the facts of this case.
 II.
Satterwhite contends that the trial court erred when it allowed the City to question her regarding a "proof of claim" that she had filed against the City of Auburn following this incident as a prelude to the potential filing of a civil suit seeking damages because, she says, this evidence was immaterial and irrelevant. (Issue III in Satterwhite's brief.) The City argues *Page 1089 
that this evidence was offered to show bias and to attack Satterwhite's credibility.
"`Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Ala. R.Evid. The credibility of a witness is always relevant and material. See, e.g., Mickle v. State, 226 Ala. 616, 617, 148 So. 319,320 (1933) ("Any fact tending to discredit the testimony of an adverse witness is always relevant and material."). Rule 616, Ala.R.Evid., provides that "[a] party may attack the credibility of a witness by presenting evidence that the witness has a bias or prejudice for or against a party or the case or that the witness has an interest in the case."
 "The case law of this state has consistently held the institution of a civil suit arising out of the same: facts as a criminal prosecution to be within the permissible scope of cross-examination to show bias on the part of the witness. This rule is augmented by the public policy of this state as codified in § 12-21-137, Code 1975, which mandates the right of every party to a `thorough and sifting' cross-examination of the opponent's witnesses. Riley v. City of Huntsville, 379 So.2d 557
(Ala. 1980).
 "The general rule, from which the more narrow rule here under consideration evolved, is stated in Green v. State, 258 Ala. 471, 64 So.2d 8-1
(1953):
 "`It is always competent on cross-examination to make such interrogation of a witness as would tend to test his interest, bias or prejudice or to illustrate or impeach the accuracy of his testimony.'
 "See also, Morrison v. State, 267 Ala. 1, 100 So.2d 744 (1957).
 "In the discharge of its fact finding functions the jury's search for the truth includes the paramount right to consider a witness's motivation, and any evidence testing `his interest, bias or prejudice' so as to `illustrate or impeach the accuracy of his testimony' is a competent, material and relevant subject of cross-examination, and the jury's right to be given such evidence is, of itself, part of the fact finding process. Green v. State, supra."
Ex parte Brooks, 393 So.2d 486, 487-88 (Ala. 1980).
 "The majority of the cases on this issue concern `the right of a defendant to cross-examine a prosecution witness concerning the contemplation of filing or pendency of a civil action against him.' Gunn v. State, 387 So.2d 280, 283 (Ala.Crim.App.), cert. denied, 387 So.2d 283 (Ala. 1980). However, the State also has the right to cross-examine the defendant or a defense witness on this matter. Gunn, supra. Furthermore, the State may cross-examine a defendant concerning a civil action against a third party. Reeves v. State, 432 So.2d 543
(Ala.Crim.App. 1983)."
Calhoun v. State, 487 So.2d 265, 267
(Ala.Crim.App. 1986). See also Gunn v. State, 387 So.2d 280,283 (Ala.Crim.App. 1980) ("While we have not found a case from this jurisdiction on point concerning the cross-examination of an accused or defense witness concerning his contemplated or pending civil action against a prosecuting witness, we see no reason why the State should not be accorded the same right of cross-examination in this instance as accorded a defendant.").
We have reviewed the transcript (R. 132-33) and find no error on the part of the trial court in allowing the City to question Satterwhite about the document she had filed with the City of Auburn. The *Page 1090 
testimony concerning the filing of that document was relevant to demonstrate bias on Satterwhite's part. The issue of Satterwhite's credibility was for the jury.
 III.
Satterwhite also contends that the trial court erred when it did not grant her motion for a judgment of acquittal because, she says, the City failed to provide enough evidence that she was unlawfully on the premises of Hastings. (Issue IV in Satterwhite's brief.) We disagree.
"`The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" Nunn v. State, 697 So.2d 497, 498
(Ala.Crim.App. 1997), quoting O'Neal v. State,602 So.2d 462, 464 (Ala.Crim.App. 1992). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State,728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State,557 So.2d 848, 850 (Ala.Crim.App. 1990).
The evidence indicated that Satterwhite did not leave Hastings after being informed that she would not be allowed to remain in the store with her dog and she was asked to leave by both a Hastings manager and Cpl. Greg. This evidence was sufficient to warrant submitting the case to the jury. Therefore, the trial court properly denied Satterwhite's motion for a judgment of acquittal.
 IV.
Finally, Satterwhite contends that her sentence of 30 days' imprisonment in the county jail is so disproportionate to the offense charged that it is cruel and unusual punishment and constitutes a violation of her Eighth Amendment rights. SeeBrown v. State, 611 So.2d 1194, 1198, n. 6 (Ala.Crim.App. 1992). (Issue V in Satterwhite's brief.)
"Criminal trespass in the third degree is a violation." §13A-7-4(b), Ala. Code 1975. "Sentences for violations shall be for a definite term of imprisonment in the county jail, not to exceed 30 days." § 13A-5-7(b), Ala. Code 1975. Satterwhite's sentence clearly falls within the statutory range. We have reviewed the record and find no abuse of discretion on the part of the trial court in sentencing Satterwhite to 30 days' imprisonment in the county jail. Thus, Satterwhite is not entitled to any relief on this issue.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB and WISE, JJ., concur.
BASCHAB, J., concurs in the result, with opinion.
[1] Section 13A-7-4(a), Ala. Code 1975, provides:
 "A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."
[2] The State does not contend that conflicting state law should take precedence over the ADA and the regulations implementing its provisions. In any event, we note that the language of the ADA indicates that Congress intended that the ADA preempt state law with which it conflicts. See, e.g.,Oconomowoc Residential Programs, Inc. v. City ofGreenfield, 23 F.Supp.2d 941 (E.D.Wis.1998); and Greenv. Housing Auth. of Clackamas County, 994 F.Supp. 1253
(D.Ore.1998). See also Am.Jur.2d New Topic Service,Americans With Disabilities Act: Analysis andImplications §§ 1, 2, and 690 (1992).
[3] We note that at the healing on Satterwhite's motion to alter, amend, or vacate the sentence, Satterwhite presented evidence indicating that the Social Security Administration found that she had "severe impairments of fibromyalgia, patella febrile dysfunction, generalized anxiety disorder and recurrent major depressive disorder." See Defendant's Exhibit # 2, detailing the decision of the administrative law judge to award disability benefits to Satterwhite. (R. 166.) However, that exhibit was not presented at trial and, therefore, cannot be considered by this Court as a basis for holding the trial court in error for refusing the requested jury instructions.
[4] Although the definition of a "disability" under the SSA is similar to the definition of a "disability" under the ADA, the two definitions are not the same. See42 U.S.C. § 423(d)(1)(A) for the definition of a "disability" under the SSA — an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."
[5] Indeed, the fact that the SSA found that Satterwhite suffered from generalized anxiety disorder and recurrent major depressive disorder suggests that Satterwhite was awarded benefits due, in no small part, to the existence of these psychological conditions, neither of which would appear to require the assistance of a service animal for mobility. The written findings of the administrative law judge who granted Satterwhite's request for Social Security benefits, see note 3, supra, indicate that Satterwhite suffers from several physical and psychological disorders. It is unclear, however, whether the psychological disorders were independent of, or directly related to, Satterwhite's physical disorder. Furthermore, it does not appear that the administrative law judge made a finding that Satterwhite's ability to walk was substantially impaired or that she was otherwise immobile. In any event, as noted previously, this evidence was submitted to the trial court following sentencing and cannot form the basis for holding the trial court in error for refusing the requested jury instructions.
[6] Some of the requested instructions were redundant and could properly have been refused for that reason alone.